## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SANDRA OSBORNE, derivatively on behalf of HONEYWELL INTERNATIONAL INC., <br><br> Plaintiff, <br><br> vs. <br><br> DARIUS E. ADAMCZYK, THOMAS A. SZLOSEK, GREGORY P. LEWIS, DAVID M. COTE, DUNCAN B. ANGOVE, WILLIAM S. AYER, KEVIN BURKE, D. SCOTT DAVIS, LINNET F. DEILY, JUDD A. GREGG, CLIVE R. HOLLICK, GRACE D. LIEBLEIN, JAIME CHICO PARDO, GEORGE PAZ, and ROBIN L. WASHINGTON, <br><br> Defendants, <br><br> and <br><br> HONEYWELL INTERNATIONAL INC., <br><br> Nominal Defendant. | C.A. No. <br><br><br> DEMAND FOR JURY TRIAL |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Sandra Osborne ("Plaintiff"), by her undersigned attorneys, derivatively and on behalf of Nominal Defendant Honeywell International Inc. ("Honeywell" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Darius E. Adamczyk, Thomas A. Szlosek, Gregory P. Lewis, David M. Cote, Duncan B. Angove, William S. Ayer, Kevin Burke, D. Scott Davis, Linnet F. Deily, Judd A. Gregg, Clive R. Hollick, Grace D. Lieblein, Jaime Chico Pardo, George Paz, and Robin L. Washington (collectively, the "Individual Defendants," and together with Honeywell, the "Defendants") for breaches of their fiduciary duties

1

as directors and/or officers of Honeywell, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for her complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Honeywell, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Honeywell's directors and officers from February 9, 2018 through the present (the "Relevant Period").

2.      Honeywell is a multinational technology and manufacturing company based in Charlotte, North Carolina. The Company develops and commercializes various industrial products, aerospace systems, and engineering services, and purports to address critical challenges facing the world concerning energy, safety, security, air travel, productivity, and global urbanization.

3.      As a publicly-traded company, Honeywell is subject to federal securities laws and must adhere to generally accepted accounting principles ("GAAP"). Among other things, GAAP requires that public companies prepare their financial statements in accordance with Accounting

Standards Codification ("ASC") 450, *Contingencies*, which provides the standards for disclosing loss and gain contingencies.

4.     Prior to the beginning of the Relevant Period, the Company inherited certain asbestos-related liabilities from two of its then-subsidiaries—North American Refractories Company ("NARCO") and Bendix Friction Materials ("Bendix").

5.     Historically, and in each of the Company's financial statements issued to the public between February 2018 and July 2018, the Company used two distinct accrual methodologies to calculate asbestos-related liabilities for NARCO and Bendix, respectively. Whereas the Company made use of a fifteen-year time horizon in estimating NARCO's asbestos liabilities (i.e., the Company included in its estimates potential liabilities that could arise over the next fifteen years), the Company estimated Bendix's asbestos liabilities on the basis of a mere five-year time horizon.

6.     In truth, the Individual Defendants were able to calculate Bendix's asbestos liabilities for more than five years into the future—yet, they declined to do so, in order to conceal the true extent of the liabilities, which were far greater than what the Individual Defendants represented to the public. Moreover, as the SEC would conclude, and as the Individual Defendants would later admit, not only did these accounting practices defy industry standard, they were in violation of ASC 450, and therefore violated GAAP.

7.     The SEC first discovered these improper accounting practices in May 2018, over the course of reviewing a draft registration statement prepared by Honeywell in connection with the planned spin-off of its Transportation Systems business into Garrett Motion Inc. ("Garrett"), a standalone company. In a series of private communications exchanged between Honeywell and the SEC from May 2018 through August 2018, the SEC repeatedly inquired as to why the Company limited its Bendix-related asbestos liability estimates to a mere five-year horizon. The

Individual Defendants ultimately conceded to the SEC that (1) there was no basis for the Company's use of a five-year horizon for its liability estimates; (2) the Company had been operating with deficient internal controls; and (3) properly applying ASC 450, Bendix's asbestos liabilities actually totaled approximately $1.7 billion, nearly three times the $616 million figure the Individual Defendants had previously disclosed to the public as to Bendix's asbestos liabilities.

8.      The truth was revealed to the public gradually, beginning on August 23, 2018, when the Individual Defendants disclosed the true extent of Bendix's asbestos liabilities, and revealed that the Company would need to revise its accounting methodology with respect to Bendix's asbestos liabilities.

9.       Then, on October 10, 2018, the SEC released previously confidential letters it had exchanged with Honeywell in August 2018, revealing, among other things, the Individual Defendants' admission that the Company's accounting practices violated ASC 450, and that the Company was operating with deficient internal controls.

10.     As these facts began to leak out to the public, the Individual Defendants repeatedly attempted to dull the impact of such disclosures by simultaneously releasing positive news related to the Company's impending spin-offs of Garrett and Resideo Technologies, Inc. ("Resideo"), another former Company business segment, including by announcing that Garrett and Resideo had agreed to indemnify the Company for hundreds of millions of dollars of its asbestos-related liabilities.

11.     Such tactics were successful in holding the Company's stock price steady on August 23, 2018, but failed to prevent a drop on October 10, 2018, when the price of the Company's stock fell from $155.76 per share at market open on October 10, 2018, to $148.86 per share at the close of trading on October 11, 2018.

12.     Finally, on October 19, 2018, the Company issued its quarterly financial results for the third fiscal quarter of 2018, which disclosed the changes to the Company's accounting methodology relating to Bendix's asbestos liabilities, and notably, revealed to the public that on September 30, 2018, Honeywell had been advised that the SEC's Division of Enforcement had opened a formal investigation into the Company and its accounting practices.

13.     On this news, the Company's stock price began a precipitous, multi-day drop, falling from $151.26 per share at market open on October 19, 2018, to $147.88 per share at the close of trading on October 22, 2018, the following trading day. The price of the Company's stock continued to plunge over the course of the next several trading days, falling to $145.93 per share at the close of trading on October 23, 2018, and finally settling at $140.83 per share at the close of trading on October 24, 2018. Various news outlets reported on these developments, linking the plunge in the Company's stock price to the Company's disclosure of the SEC's investigation.

14.     Not long after these revelations, Garrett reported a material weakness in its internal controls, due in part to the fact that Garrett was "unable to independently verify the accuracy of the certain information Honeywell provided to us that we used to calculate the amount of our Indemnification Liability."

15.     Roughly a year later, on December 2, 2019, Garrett filed an action in the Supreme Court of the State of New York, captioned, *Garrett Motion Inc., et al. v. Honeywell International Inc., et al.*, Index No. 657106/2019 (the "Garrett Action"), naming the Company and its CEO as defendants, and alleging that the Company's indemnification agreement with Garrett was manifestly unconscionable, and had been engineered in order to convince the market that the Company would no longer be encumbered by its over $1 billion in Bendix-related asbestos liabilities.

16.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to engage in improper accounting practices relating to Bendix's asbestos liabilities, and by personally making and/or causing the Company to make a series of materially false and/or misleading statements regarding the Company's business, operations, prospects, and regulatory compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company had engaged in improper accounting methods in order to conceal the true extent of Bendix's asbestos liabilities, in violation of ASC 450; (2) the Company was able to estimate potential liability arising from Bendix-related asbestos claims more than five years into the future, contrary to the Individual Defendants' representations; (3) as a result of the foregoing, the Company's income was artificially inflated, and the Company's financial statements were inaccurate and were not in compliance with GAAP or relevant industry norms; (4) as a further result of the foregoing, the SEC would inquire into the Company's accounting practices related to Bendix's asbestos liabilities, which would ultimately lead to a full-blown investigation; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

17.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

18.     Also in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

19.     Furthermore, during the Relevant Period, when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein, the Individual Defendants caused the Company to repurchase millions of shares of its own stock at prices that were artificially inflated due to the foregoing misrepresentations, while two of them engaged in lucrative insider sales, netting proceeds of approximately 2.36 million. More than 20.6 million shares of the Company's common stock were repurchased during the Relevant Period for over $3.14 billion. As the Company's stock was actually only worth $140.83 per share during that time, the price at closing on October 24, 2018, the Company overpaid by over $235 million in total.

20.     In light of the Individual Defendants' misconduct, which has subjected the Company and its CEO to the Garrett Action, the Company, its CEO, and its former CFO to a consolidated federal securities fraud class action lawsuits pending in the United States District Court for the District of New Jersey (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, the losses from the waste of corporate assets, including through overpayment for stock through repurchases, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

21.     In the Securities Class Action, District Judge William J. Martini denied defendants Honeywell, Darius E. Adamczyk, Thomas A. Szlosek, and Gregory P. Lewis's motion to dismiss on May 18, 2020, finding that defendants' statements about the extent of Bendix's asbestos liabilities, statements about the Company's ability to estimate asbestos-related liabilities beyond a five-year period, certifications attesting to the accuracy of the Company's financial statements, and the failures to disclose the SEC's inquiry constituted material misstatements or omissions.

Securities Class Action Order at 5–7, *Kanefsky v. Honeywell International Inc., et al.*, Docket No. 2:18-cv-15536-WJM-JAD, (D.N.J. May 18, 2020) ("Securities Class Action Order").

22.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Honeywell's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

<u>JURISDICTION AND VENUE</u>

23.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

24.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

25.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

26.     Venue is proper in this District because Honeywell is incorporated in this District. In addition, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

27.     Plaintiff is a current shareholder of Honeywell.  Plaintiff has continuously held Honeywell common stock at all relevant times.

### Nominal Defendant Honeywell

28.     Honeywell is a Delaware corporation with its principal executive offices at 300 South Tryon Street, Charlotte, North Carolina 28202.  Honeywell's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "HON."

### Defendant Adamczyk

29.     Defendant Darius E. Adamczyk ("Adamczyk") has served as the Company's Chairman and CEO since April 2018. He previously served as President and CEO from March 2017 to April 2018, and as Chief Operating Officer from April 2016 to March 2017. According to the Company's Schedule 14A filed with the SEC on March 12, 2020 (the "2020 Proxy Statement), as of February 18, 2020, Defendant Adamczyk beneficially owned 1,130,703 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on February 18, 2020 was $179.42, Defendant Adamczyk owned over $202 million worth of Honeywell stock.

30.     For the fiscal year ended December 31, 2018, Defendant Adamczyk received $19,246,604 in compensation from the Company.  This included $1,571,154 in salary, $9,561,215 in stock awards, $3,185,655 in option awards, $4,100,000 in non-equity incentive plan

compensation, $595,082 in change in pension value and nonqualified deferred compensation earnings, and $233,498 in all other compensation.

31.     The Company's 2020 Proxy Statement stated the following about Defendant Adamczyk:

> Mr. Adamczyk has been the Chairman and Chief Executive Officer of Honeywell since April 2018. Mr. Adamczyk was President and Chief Executive Officer from March 2017 to April 2018 and Chief Operating Officer from April 2016 to March 2017. From April 2014 to April 2016, Mr. Adamczyk served as President and CEO of Honeywell Performance Materials and Technologies (PMT). Prior to serving as President and CEO of PMT, Mr. Adamczyk served as President of Honeywell Process Solutions from 2012 to 2014 and as President of Honeywell Scanning and Mobility from 2008 to 2012. Mr. Adamczyk joined Honeywell in 2008 when Metrologic, Inc., where he was the Chief Executive Officer, was acquired by Honeywell. Prior to Metrologic, Mr. Adamczyk held several general management assignments at Ingersoll Rand, served as a senior associate at Booz Allen Hamilton, and started his career as an electrical engineer at General Electric.

**Defendant Szlosek**

32.     Defendant Thomas A. Szlosek served as the Company's CFO from April 2014 until he resigned on August 3, 2018.

33.     For the fiscal year ended December 31, 2018, Defendant Szlosek received $6,203,404 in compensation from the Company.  This included $560,481 in salary, $4,050,122 in stock awards, $1,348,050 in option awards, $229,616 in change in pension value and nonqualified deferred compensation earnings, and $15,135 in all other compensation.

**Defendant Lewis**

34.     Defendant Gregory P. Lewis ("Lewis") has served as the Company's Senior Vice President and CFO since August 3, 2019. According to the 2020 Proxy Statement, as of February 18, 2020, Defendant Lewis beneficially owned 151,895 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 18, 2020 was $179.42, Defendant Lewis owned over $27.2 million worth of Honeywell stock.

35.     For the fiscal year ended December 31, 2018, Defendant Lewis received $2,606,493 in compensation from the Company.  This included $578,981 in salary, $554,742 in stock awards, $591,250 in option awards, $730,000 in non-equity incentive plan compensation, $103,155 in change in pension value and nonqualified deferred compensation earnings, and $48,365 in all other compensation.

36.     The Company's website stated the following about Defendant Lewis:[1]

Greg Lewis is Senior Vice President and Chief Financial Officer (CFO).

Since joining Honeywell in 2006, Greg has held a series of finance leadership roles. Most recently, he was Vice President of Corporate Finance, where he led Treasury, Tax, Audit, Business Analysis and Planning, Investor Relations, M&A, Real Estate, Pension, Finance Operations and Enterprise Information Management (EIM). He focused on building a culture of managing data and information as a strategic asset.

Previously, he first served as CFO of the former Specialty Products unit within Performance Materials and Technologies (PMT). Subsequently, he served as Vice President of Business Analysis and Planning (BAP), CFO for Honeywell Process Solutions (HPS) and then held the same position for Automation and Control Solutions (ACS).

With a broad background in financial leadership across multiple industries, Greg began his career at Kraft Foods in 1991 and went onto roles at Tyco International, A&E and the Stanley Works.

Greg holds a master's degree in business administration from Fordham University and a bachelor's degree in finance from the University of Connecticut. He is also Six Sigma Green Belt Certified.

**Defendant Cote**

37.     Defendant David M. Cote ("Cote") served as the Company's Executive Chairman from March 2017 until he resigned on April 23, 2018. He previously served as the Company's CEO from 2002 until March 2017.

---

[1] https://www.honeywell.com/en-us/company/leadership/greg-lewis (last visited June 3, 2020).

38. The Company's Schedule 14A filed with the SEC on March 10, 2016 (the "2016 Proxy Statement") stated the following about Defendant Cote:

> Mr. Cote has been Chairman and Chief Executive Officer since July 2002. He joined Honeywell as President and Chief Executive Officer in February 2002. Prior to joining Honeywell, he served as Chairman, President and Chief Executive Officer of TRW Inc., a provider of products and services for the aerospace, information systems and automotive markets, from August 2001 to February 2002. From February 2001 to July 2001, he served as TRW's President and Chief Executive Officer and from November 1999 to January 2001 he served as its President and Chief Operating Officer. Mr. Cote was Senior Vice President of General Electric Company and President and Chief Executive Officer of GE Appliances from June 1996 to November 1999. Mr. Cote is a director of the Federal Reserve Bank of New York. He previously served as a director of JPMorgan Chase & Co. (2007-2013).

**Defendant Angove**

39. Defendant Duncan B. Angove ("Angove") has served as a Company director since February 2018. He also serves as a member of the Management Development and Compensation Committee. According to the 2020 Proxy Statement, as of February 18, 2020, Defendant Angove beneficially owned 3,285 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 18, 2020 was $179.42, Defendant Angove owned approximately $589,394 worth of Honeywell stock.

40. For the fiscal year ended December 31, 2018, Defendant Angove received $273,868 in compensation from the Company. This included $173,434 in fees earned or paid in cash, $50,116 in stock awards, $50,314 in option awards, and $4 in all other compensation.

41. The Company's 2020 Proxy Statement stated the following about Defendant Angove:

> Since 2019, Mr. Angove has been the Chief Executive Officer of Arcspring LLC, a new-era investment management platform that creates value through powerful digital pivots. Previously, from 2010 to 2018, Mr. Angove was President of Infor, Inc., a privately held provider of enterprise software and a strategic technology partner for more than 90,000 organizations worldwide. Infor's software is purpose-built for specific industries, from manufacturing to healthcare, providing complete

12

suites that are designed to support end-to-end business processes and digital transformation. Previously, Mr. Angove served as the Senior Vice President and General Manager of the Retail Global Business Unit of Oracle Corporation, a global technology provider of enterprise software, hardware, and services, from 2005 to 2010. He joined Oracle through its acquisition of Retek Inc., then a publicly-traded provider of software solutions and services to the retail industry, where he served in various roles of increasing responsibility from 1997 until 2005.

**Defendant Ayer**

42.     Defendant William S. Ayer ("Ayer") has served as a Company director since 2015.

He also serves as a member of the Management Development and Compensation Committee and

the Corporate Governance and Responsibility Committee. According to the 2020 Proxy Statement,

as of February 18, 2020, Defendant Ayer beneficially owned 15,410 shares of the Company's

common stock.  Given that the price per share of the Company's common stock at the close of

trading on February 18, 2020 was $179.42, Defendant Ayer owned over $2.76 million worth of

Honeywell stock.

43.     For the fiscal year ended December 31, 2018, Defendant Ayer received $305,434

in compensation from the Company.  This included $180,000 in fees earned or paid in cash,

$50,116 in stock awards, $50,314 in option awards, and $25,004 in all other compensation.

44.     The Company's 2020 Proxy Statement stated the following about Defendant Ayer:

Mr. Ayer is the retired Chairman and Chief Executive Officer of Alaska Air Group, Inc. (Alaska Air Group), the parent company of Alaska Airlines and its sister carrier, Horizon Air. Mr. Ayer served as Chief Executive Officer of Alaska Air Group and its subsidiaries through 2012, and as Chairman through 2013. A veteran of more than three decades in aviation, Mr. Ayer began his career with Horizon Air in 1982, where he held a variety of marketing and operations positions. He joined Alaska Airlines in 1995 as Vice President of Marketing and Planning, and subsequently held the posts of Senior Vice President, Chief Operating Officer, and President. In 2002, he became Alaska Air Group's Chief Executive Officer, and, in May 2003, he was appointed Chairman. Mr. Ayer previously served on the Board of Directors of the Seattle Branch of the Federal Reserve Bank of San Francisco and was a director of Puget Sound Energy, Inc. and Puget Energy, Inc. from January 2005 until January 2015, serving as Chairman from January 2009 until January 2015.

**Defendant Burke**

45.      Defendant Kevin Burke ("Burke") has served as a Company director since 2010. He also serves as a member of the Audit Committee. According to the 2020 Proxy Statement, as of February 18, 2020, Defendant Burke beneficially owned 47,763 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on February 18, 2020 was $179.42, Defendant Burke owned over $8.56 million worth of Honeywell stock.

46.      For the fiscal year ended December 31, 2018, Defendant Burke received $310,434 in compensation from the Company.  This included $185,000 in fees earned or paid in cash, $50,116 in stock awards, $50,314 in option awards, and $25,004 in all other compensation.

47.      The Company's 2020 Proxy Statement stated the following about Defendant Burke:

Mr. Burke is the retired Chairman, President, and Chief Executive Officer of Consolidated Edison, Inc. (Con Edison), a utility provider of electric, gas, and steam services. He joined Con Edison in 1973 and held positions of increasing responsibility in system planning, engineering, law, nuclear power, construction, and corporate planning. Mr. Burke served as President and Chief Executive Officer from 2005 through 2013, and was elected Chairman in 2006. Mr. Burke became non-executive Chairman of Con Edison in December 2013 and served in that capacity until April 2014. He served as Senior Vice President from July 1998 to July 1999, with responsibility for customer service and for Con Edison's electric transmission and distribution systems. In 1999, Mr. Burke was elected President of Orange and Rockland Utilities, Inc., a subsidiary of Con Edison. He was elected President and Chief Operating Officer of Consolidated Edison Company of New York, Inc. in 2000 and elected Chief Executive Officer in 2005. Mr. Burke was a member of the Board of Directors of Con Edison and a member of the Board of Trustees of Consolidated Edison Company of New York, Inc., which is a subsidiary of Con Edison, until May 2015.

**Defendant Davis**

48.      Defendant D. Scott Davis ("Davis") has served as a Company director since 2006, and as the Company's lead director since April 27, 2020. He also serves as a member of the Audit Committee. According to the 2020 Proxy Statement, as of February 18, 2020, Defendant Davis

beneficially owned 57,718 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on February 18, 2020 was $179.42, Defendant Davis owned over $10.3 million worth of Honeywell stock.

49.    For the fiscal year ended December 31, 2018, Defendant Davis received $317,740 in compensation from the Company.  This included $205,000 in fees earned or paid in cash, $50,116 in stock awards, $50,314 in option awards, $10,319 in change in pension value and nonqualified deferred compensation earnings, and $1,991 in all other compensation.

50.    The Company's 2020 Proxy Statement stated the following about Defendant Davis:

> Mr. Davis joined United Parcel Service, Inc. (UPS), a leading global provider of package delivery, specialized transportation, and logistics services in 1986. He served as the non-Executive Chairman of UPS from September 2014 until May 2016 and as Chairman and Chief Executive Officer from January 1, 2008 to September 2014. Prior to that, he served as Vice Chairman starting December 2006 and as Senior Vice President, Chief Financial Officer and Treasurer starting January 2001. Previously, Mr. Davis held various leadership positions with UPS, primarily in the finance and accounting areas. During his tenure at UPS, Mr. Davis served a critical role in helping UPS to reinvent itself into a technology company. Prior to joining UPS, he was Chief Executive Officer of II Morrow Inc., a technology company and developer of general aviation and marine navigation instruments. Mr. Davis is a Certified Public Accountant. He also is a director of Johnson and Johnson. Mr. Davis previously served on the Board of the Federal Reserve Bank of Atlanta (2003-2009), serving as Chairman in 2009, and as a director of EndoChoice Holdings (2015-2016).

**Defendant Deily**

51.    Defendant Linnet F. Deily ("Deily") has served as a Company director since 2006. She also serves as a member of the Audit Committee, and as the Chair of the Corporate Governance and Responsibility Committee. According to the 2020 Proxy Statement, as of February 18, 2020, Defendant Deily beneficially owned 33,109 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on February 18, 2020 was $179.42, Defendant Deily owned over $5.94 million worth of Honeywell stock.

52.     For the fiscal year ended December 31, 2018, Defendant Deily received $335,465 in compensation from the Company.  This included $205,000 in fees earned or paid in cash, $50,116 in stock awards, $50,314 in option awards, and $30,035 in all other compensation.

53.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Deily made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|------|------------------|-----------------|----------|
| 2/14/2018 | 2,886 | $147.71 | $426,291 |
| 7/30/2018 | 3,066 | $158.12 | $484,795 |

54.     Thus, in total, before the fraud was exposed, she sold 5,952 Company shares on inside information, for which she received approximately $1,395,881. Her insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

55.     The Company's 2020 Proxy Statement stated the following about Defendant Deily:

Ms. Deily was Deputy U.S. Trade Representative and U.S. Ambassador to the World Trade Organization from 2001 to 2005. From 2000 until 2001, she was Vice Chairman of The Charles Schwab Corp. Ms. Deily served as President of the Schwab Retail Group from 1998 until 2000 and President of Schwab Institutional-Services for Investment Managers from 1996 to 1998. Prior to joining Schwab, she was the Chairman of the Board, Chief Executive Officer, and President of First Interstate Bank of Texas from 1990 until 1996. She previously served as a director of Chevron Corporation (2005-2018).

**Defendant Gregg**

56.     Defendant Judd A. Gregg ("Gregg") has served as a Company director since 2011. He also serves as a member of the Audit Committee, and the Management Development and Compensation Committee. According to the 2020 Proxy Statement, as of February 18, 2020, Defendant Gregg beneficially owned 45,635 shares of the Company's common stock.  Given that

the price per share of the Company's common stock at the close of trading on February 18, 2020 was $179.42, Defendant Gregg owned over $8.18 million worth of Honeywell stock.

57.     For the fiscal year ended December 31, 2018, Defendant Gregg received $310,434 in compensation from the Company.  This included $185,000 in fees earned or paid in cash, $50,116 in stock awards, $50,314 in option awards, and $25,004 in all other compensation.

58.     The Company's 2020 Proxy Statement stated the following about Defendant Gregg:

> Sen. Gregg has spent over three decades in public office, most recently serving as the United States Senator from the State of New Hampshire from January 1993 until January 2011. During his tenure in the Senate, Sen. Gregg served on a number of key Senate Committees, including Budget; Appropriations; Government Affairs; Banking, Housing and Urban Affairs; Commerce, Science and Transportation; Foreign Relations; and Health, Education, Labor and Pensions. He has served as the Chairman and Ranking Member of the Health, Education, Labor and Pensions Committee, the Chairman and Ranking Member of the Senate Budget Committee as well as chairman of various sub-committees. Sen. Gregg served as a chief negotiator of the Emergency Economic Stabilization Act of 2008, was the lead sponsor of the Deficit Reduction Act of 2005, and, along with the late Sen. Ted Kennedy, co-authored the No Child Left Behind Act of 2001. In March 2010, Senator Gregg was appointed to President Obama's bipartisan National Commission on Fiscal Responsibility and Reform. From 1989 to 1993, Sen. Gregg was the Governor of New Hampshire and prior to that was a U.S. Representative from 1981 to 1989. Sen. Gregg was named as Dartmouth College's first distinguished fellow. He also serves as a director of Evoqua Corporation. Sen. Gregg previously served as a director of Intercontinental Exchange, Inc. (2011-2013).

**<u>Defendant Hollick</u>**

59.     Defendant Clive R. Hollick ("Hollick") has served as a Company director since 2004. He also serves as a member of the Management Development and Compensation Committee. According to the 2020 Proxy Statement, as of February 18, 2020, Defendant Hollick beneficially owned 57,729 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on February 18, 2020 was $179.42, Defendant Hollick owned over $10.3 million worth of Honeywell stock.

60.     For the fiscal year ended December 31, 2018, Defendant Hollick received $337,168 in compensation from the Company.  This included $180,000 in fees earned or paid in cash, $50,116 in stock awards, $50,314 in option awards, $11,399 in change in pension value and nonqualified deferred compensation earnings, and $45,339 in all other compensation.

61.     The Company's 2020 Proxy Statement stated the following about Defendant Hollick:

> Lord Hollick was Chief Executive Officer of United Business Media and its predecessor companies from 1974 to 2005. United was a London-based, international information, Business Media broadcasting, financial services, and publishing group. From 2005 to 2010, he was a partner, managing director, and advisor of Kohlberg Kravis Roberts and Co., a private equity firm focusing on businesses in the media and financial services sectors. In addition, Lord Hollick was Chairman of the Economic Affairs Committee of the House of Lords. He previously served as a director of ProSiebenSat. 1 Media AG (2007-2014), Gogo Inc. (2013-2014), The Nielsen Company B.V. (2006-2009), Diageo plc (2001-2011), TRW Inc. (2000-2002), and BAE Systems (1992-1997).

**Defendant Lieblein**

62.     Defendant Grace D. Lieblein ("Lieblein") has served as a Company director since 2013. She also serves as a member of the Corporate Governance and Responsibility Committee, and as the Chair of the Management Development and Compensation Committee. According to the 2020 Proxy Statement, as of February 18, 2020, Defendant Lieblein beneficially owned 25,329 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on February 18, 2020 was $179.42, Defendant Lieblein owned over $4.54 million worth of Honeywell stock.

63.     For the fiscal year ended December 31, 2018, Defendant Lieblein received $295,657 in compensation from the Company.  This included $180,000 in fees earned or paid in cash, $50,116 in stock awards, $50,314 in option awards, and $15,277 in all other compensation.

64.     The Company's 2020 Proxy Statement stated the following about Defendant Lieblein:

> Ms. Lieblein served as Vice President, Global Quality of General Motors (GM), a company that designs, manufactures and markets cars, crossovers, trucks, and automobile parts worldwide, from November 2014 to March 2016. Ms. Lieblein served as Vice President, Global Purchasing and Supply Chain from December 2012 to November 2014, the GM Brazil President and Managing Director from June 2011 until December 2012, the GM Mexico President and Managing Director from January 2009 until June 2011, and Vehicle Chief Engineer from October 2004 to January 2009. Ms. Lieblein joined GM in 1978 as a co-op student at the General Motors Assembly Division in Los Angeles and held a variety of leadership positions at GM in engineering, product development, and manufacturing. Ms. Lieblein also is a director of Southwest Airlines Co. and American Tower Corporation.

**Defendant Chico Pardo**

65.     Defendant Jaime Chico Pardo ("Chico Pardo") served as the Company's lead director from 2000 until he resigned on April 27, 2020. According to the 2020 Proxy Statement, as of February 18, 2020, Defendant Chico Pardo beneficially owned 62,797 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on February 18, 2020 was $179.42, Defendant Chico Pardo owned over $11.2 million worth of Honeywell stock.

66.     For the fiscal year ended December 31, 2018, Defendant Chico Pardo received $342,765 in compensation from the Company.  This included $215,000 in fees earned or paid in cash, $50,116 in stock awards, $50,314 in option awards, and $27,335 in all other compensation.

67.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Chico Pardo made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 2/26/2018 | 2,868 | $156.36 | $448,440 |
| 5/25/2018 | 3,426 | $150,59 | $515,921 |

68.     Thus, in total, before the fraud was exposed, he sold 6,294 Company shares on inside information, for which he received approximately $964,361. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

69.     The Company's Schedule 14A filed with the SEC on March 14, 2019 (the "2019 Proxy Statement") stated the following about Defendant Chico Pardo:

> Mr. Chico Pardo has been President and Chief Executive Officer of ENESA, S.A. de C.V. (ENESA), a private fund investing in the Mexican energy and health care sectors since March 2010. He previously served as Co-Chairman of the Board of Telefonos de Mexico, S.A.B. de C.V. (TELMEX), a telecommunications company based in Mexico City, from April 2009 until April 2010, as its Chairman from October 2006 to April 2009, and as its Vice Chairman and Chief Executive Officer from 1995 until 2006. Mr. Chico Pardo was Co-Chairman of the Board of Impulsora del Desarrollo y el Empleo en América Latina, S.A. de C.V., a publicly listed company in Mexico engaged in investment in and management of infrastructure assets in Latin America, from 2006 until 2010. He also was Chairman of Carso Global Telecom, S.A. de C.V. from 1996 until 2010. Prior to joining TELMEX, Mr. Chico Pardo served as President and Chief Executive Officer of Grupo Condumex, S.A. de C.V. and Euzkadi/General Tire de Mexico, manufacturers of products for the construction, automotive, and telecommunications industries. Mr. Chico Pardo also has spent a number of years in the international and investment banking business. Mr. Chico Pardo is a director of Grupo Bimbo, S.A.B. de C.V. and PROMECAP Acquisition Company, S.A.B. de C.V. He previously served as a director of AT&T (2008-2015), Grupo Carso, S.A. de C.V. and several of its affiliates (1991-2013), three mutual funds in the American Funds family of mutual funds (2011-2013) and Honeywell Inc. from September 1998 to December 1999.

**Defendant Paz**

70.     Defendant George Paz ("Paz") has served as a Company director since 2009. He also serves as the Chair of the Audit Committee, and as a member of the Corporate Governance and Responsibility Committee. According to the 2020 Proxy Statement, as of February 18, 2020, Defendant Paz beneficially owned 49,443 shares of the Company's common stock.  Given that the

price per share of the Company's common stock at the close of trading on February 18, 2020 was

$179.42, Defendant Paz owned over $8.87 million worth of Honeywell stock.

71.     For the fiscal year ended December 31, 2018, Defendant Paz received $330,434 in

compensation from the Company.  This included $205,000 in fees earned or paid in cash, $50,116

in stock awards, $50,314 in option awards, and $25,004 in all other compensation.

72.     The Company's 2020 Proxy Statement stated the following about Defendant Paz:

> Mr. Paz served as Chairman of the Board of Express Scripts Holding Company
> (Express Scripts), a pharmacy benefit management company, from May 2006 to its
> acquisition by Cigna in December 2018, as Chief Executive Officer from April
> 2005 to May 2016, and as President from October 2003 to February 2014. He first
> became a director of Express Scripts in January 2004. Mr. Paz joined Express
> Scripts as Senior Vice President and Chief Financial Officer in January 1998 and
> continued to serve as its Chief Financial Officer following his election as President
> until April 2004. Mr. Paz is a Certified Public Accountant. He also is a director of
> Prudential Financial, Inc.

### Defendant Washington

73.     Defendant Robin L. Washington ("Washington") has served as a Company director

since 2013. She also serves as a member of the Audit Committee. According to the 2020 Proxy

Statement, as of February 18, 2020, Defendant Washington beneficially owned 28,895 shares of

the Company's common stock.  Given that the price per share of the Company's common stock at

the close of trading on February 18, 2020 was $179.42, Defendant Washington owned over $5.18

million worth of Honeywell stock.

74.     For the fiscal year ended December 31, 2018, Defendant Washington received

$294,721 in compensation from the Company.  This included $194,287 in fees earned or paid in

cash, $50,116 in stock awards, $50,314 in option awards, and $4 in all other compensation.

75.     The Company's 2020 Proxy Statement stated the following about Defendant

Washington:

Ms. Washington served as Executive Vice President and Chief Financial Officer of Gilead Sciences, Inc. (Gilead), a research-based biopharmaceutical company, from May 2008 through October 2019. In that role, she oversaw Gilead's Global Finance, Investor Relations, and Information Technology organizations. From 2006 through 2007, Ms. Washington served as Chief Financial Officer of Hyperion Solutions, an enterprise software company that was acquired by Oracle Corporation in March 2007. Prior to that, Ms. Washington spent nearly 10 years at PeopleSoft, a provider of enterprise application software, where she served in a number of executive positions, most recently in the role of Senior Vice President and Corporate Controller. Ms. Washington is a Certified Public Accountant. She is a director of Alphabet Inc., Salesforce.com Inc., and Vertiv Group Corp., and she previously served as a director of Tektronix, Inc. (acquired by Danaher Corporation) (2005-2007) and MIPS Technologies, Inc. (acquired by Imagination Technologies Group PLC) (2008-2013).

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

76.     By reason of their positions as officers, directors, and/or fiduciaries of Honeywell and because of their ability to control the business and corporate affairs of Honeywell, the Individual Defendants owed Honeywell and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Honeywell in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Honeywell and its shareholders so as to benefit all shareholders equally.

77.     Each director and officer of the Company owes to Honeywell and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

78.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Honeywell, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

22

79.     To discharge their duties, the officers and directors of Honeywell were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

80.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Honeywell, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Honeywell's Board at all relevant times.

81.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this

complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

82.     To discharge their duties, the officers and directors of Honeywell were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Honeywell were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Honeywell's own Code of Business Conduct (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Honeywell conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Honeywell and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Honeywell's operations would comply with

all applicable laws and Honeywell's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

83.     Each of the Individual Defendants further owed to Honeywell and the shareholders the duty of loyalty requiring that each favor Honeywell's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

84.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Honeywell and were at all times acting within the course and scope of such agency.

85.     Because of their advisory, executive, managerial, and directorial positions with Honeywell, each of the Individual Defendants had access to adverse, non-public information about the Company.

86.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Honeywell.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

87.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

88.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

89.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Honeywell was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

90.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with

actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

91.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Honeywell, and was at all times acting within the course and scope of such agency.

## HONEYWELL'S CODE OF CONDUCT

92.     Honeywell's Code of Conduct provides that it "applies to all employees, officers and directors of Honeywell.".

93.     In a section titled, "Complying with the Law," the Code of Conduct states the following, in relevant part:

> Laws and regulations are complex and subject to change, and they often vary from country to country. Company policies may also be subject to change, and may vary greatly depending on the country in which we are operating. For these reasons, we must take care to familiarize ourselves with the policies, procedures and laws that apply to our particular job functions and locations in which we operate. If a local law conflicts with our Code, comply with local law. If a local custom or practice conflicts with our Code, comply with the Code.

94.     In a section titled, "Avoiding Insider Trading," the Code of Conduct states the following, in relevant part:

> ***In order to protect investors, securities laws make it illegal for those with "material inside information" about a company to trade in its securities***. "Material inside information" is information that is not generally available to the investing public and, if disclosed, would reasonably be expected to affect the price of a security or would influence your decision to buy, sell, or hold a security. Examples of material inside information include: earnings announcements; mergers, acquisitions, and dispositions; the outcome of major litigation; a change in control of the Company; and a change in senior management. This list of examples is not exhaustive and material inside information may arise in connection with other events not listed here. You should consult the Insider Trading Policy for a more detailed discussion on material inside information.

During the course of your work with Honeywell, you may learn about material inside information regarding Honeywell or another company that is not yet public. You may have access to this material inside information through your job duties with Honeywell or through other ways such as attending formal or informal meetings, overhearing a conversation, or seeing a document on a copy machine. ***Using this information or conveying this information to others for financial or other personal gain is a violation of our policy on insider trading and may also violate securities laws.***

\* \* \*

Certain individuals, because of their positions with the Company (including the Company's directors, officers, and other key employees involved in certain financial and other forecasting activities), are viewed as possessing material inside information and are designated as "insiders." These individuals are subject to additional restrictions (such as pre-clearance authorization) which are more fully described in the Insider Trading Policy.

Violations of securities laws may subject the individuals involved to severe consequences, including both civil and criminal prosecution. If you have questions or need guidance in this area, please consult the Law Department.

(Emphasis added.)

95.     In a section titled, "Seeking Business Openly and Honestly," the Code of Conduct

states the following:

Our actions in the marketplace define who we are as a Company. By competing on the quality of our goods and services, we uphold Honeywell's reputation. We will never seek to limit the competitive opportunities of our rivals in deceitful or fraudulent ways.

***In addition, we never take advantage of anyone through unfair dealing practices. This means that we are careful not to misrepresent the quality, features, or availability of our products or services.*** In addition, we do not disparage or make untrue statements about our competitors' products or services. We seek to win business based on the quality of our products and our people, ***not through any improper means***.

(Emphasis added.)

96.     In a section titled, "Following Accurate Billing Procedures," the Code of Conduct

states the following:

> ***Our reputation in the marketplace is a critical Company asset***. For that reason, we reflect accurately on all invoices to customers the sale price or cost of goods or services sold and other terms of sale. ***We each have a responsibility to maintain accurate and complete records in order to allow Honeywell to uphold this commitment.*** Never falsify any record – time card, expense report, sales numbers, test or quality records, or any other kind of record created during the course of your work for our Company – or make misleading or artificial entries on Honeywell's books or records.

(Emphasis added.)

97.     In a section titled, "Honest and Accurate Books and Records," the Code of Conduct states the following, in relevant part:

> ***Our shareowners rely on us to maintain accurate and complete books and records***. These documents form the basis for all of our public disclosures and filings, which aim to give our Shareowners and the public an accurate view of our Company's operations and financial standing. In addition, Honeywell uses these documents to analyze Company operations and make important business decisions.
>
> ***We have a duty and a legal obligation to make sure that the information we submit in all Company records is complete, accurate, and understandable***. This includes, but is not limited to, all of the information we provide in the following records:
>
> - Accounting and financial records
>
> - Payroll documents
>
> - Timecards and time recording systems
>
> - Travel and expense reports
>
> - Measurement, product testing, and performance records
>
> - Customer and supplier records
>
> - Design and engineering records
>
> - Export and import declarations and records
>
> - Project accounting records

> ***Honest and accurate books and records play a significant role in our Company's reputation. As such, we must never make a false representation in Company documents.***
>
> Our Company's transactions will be executed only in accordance with management's general or specific authorizations.

(Emphasis added.)

98.     In a section titled, "Financial Disclosures and Fraud," the Code of Conduct states

the following:

> ***Those of us with finance and accounting responsibilities have a special duty to ensure that our Company's financial statements are true and fair***. Since Honeywell is a U.S.-based public company, we must submit various financial reporting and other filings to U.S. regulatory authorities. ***It is critical that these documents are accurate and timely***. Therefore, if you have related responsibilities, you must comply with the legal and regulatory requirements that govern these reports. You also must know and follow Honeywell's internal controls that govern the same. ***Inaccurate, incomplete, or untimely records or reporting may result in legal liability for those involved.***
>
> Anyone found to have engaged in financial fraud will be subject to disciplinary action and could face substantial civil and criminal liability. You must report any suspected accounting or auditing irregularities immediately. Honeywell will not tolerate retaliation against you for disclosing, in good faith, questionable or improper accounting or financial matters.

(Emphasis added.)

99.     In a section titled, "Audits and Investigations," the Code of Conduct states the

following:

> ***We all share a responsibility to cooperate with external and internal audits and investigations. This means we must provide auditors and investigators the information to which they are entitled, and maintain the confidentiality of the investigation***. In addition, we may never attempt to interfere with or improperly influence their review. Refusal or failure to cooperate fully with an internal Honeywell or government investigation, or the failure to be fully truthful when providing evidence or testimony in such investigation, may result in disciplinary action, up to and including termination. If you have any questions about what information an auditor or investigator is requesting and entitled to obtain, consult with the Law Department or Corporate Audit. If a governmental investigation

occurs, management must contact the Law Department as soon as possible before proceeding.

(Emphasis added.)

100.    In a section titled, "Records Management," the Code of Conduct states the following, in relevant part:

> It is our shared responsibility to retain Honeywell business records as long as needed for business purposes or longer, if required by law, tax, regulatory, or other standards. In addition, we need to know when and how to destroy these business records. Follow all rules set forth in our Records Management Policy. The Records Management Policy includes the Records Retention Schedule, which provides guidance regarding the length of time various records should be retained. Honeywell encourages employees to review their records on a regular basis and to purge old documents in accordance with the Records Management Policy.

101.    In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to engage in improper accounting methods, to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act, and aiding and abetting thereof.  Moreover, in violation of the Code of Conduct, the Individual Defendants failed to comply with laws and regulations, maintain the "accuracy of company records, public reports and communications," and uphold the employee and director responsibilities related thereto.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

102.    Founded in 1906, Honeywell is a diversified technology and manufacturing conglomerate with operations spanning the globe. The Company develops and provides aerospace products and services, electronics and advanced materials, specialty chemicals, petrochemical refining technology, productivity and security technologies for buildings and industries, and more.

103.    The Company's business is divided into four segments: Aerospace, Honeywell Building Technologies, Performance Materials and Technologies, and Safety and Productivity Solutions. Honeywell also owns dozens of subsidiaries both in the US and abroad.

**Honeywell's Asbestos-Related Liabilities**

104.    In 1979 and 1983, respectively, Honeywell acquired NARCO and Bendix, two manufacturing and engineering companies that produced brake pads and linings, vacuum tubes, furnace fittings, and other related products. Honeywell ultimately sold NARCO in 1986, and Bendix in 2014. However, the Company inherited certain asbestos-related liabilities from the two subsidiaries, and these liabilities remained with the Company after it had sold NARCO and Bendix.

105.    Asbestos is a heat-resistant mineral fiber historically used as an insulator in various building construction materials, as well as in manufactured goods such as automobile parts. Asbestos is highly toxic, and for thousands of years has been known to cause various health issues, such as lung scarring. Despite this, Asbestos was used widely throughout the world until the second half of the 20th century, when scientific studies established a definitive link between exposure to asbestos and certain cancers, including mesothelioma, a type of lung cancer.

106.    Both NARCO and Bendix used asbestos in their products. NARCO used asbestos in its ceramic refractory products, which allowed furnaces to withstand high temperatures, whereas Bendix used asbestos as a friction material in its brake pads and other automotive products. As a result, both companies eventually became subject to thousands of lawsuits seeking damages for wrongful exposure to asbestos.

107.    From the outset, Honeywell calculated NARCO's asbestos liabilities using different accrual methods than it used to calculate Bendix's asbestos liabilities. For instance,

Honeywell's annual report on Form 10-K for the fiscal year ended December 31, 2017 (the "2017 10-K") described Honeywell's accrual methodology for NARCO's liabilities, which based its estimates on a fifteen-year time horizon, as follows:

> Honeywell's involvement in asbestos related personal injury actions relates to two predecessor companies. Regarding North American Refractories Company ("NARCO") asbestos related claims, we accrued for pending claims based on terms and conditions in agreements with NARCO, its former parent company, and certain asbestos claimants, and an estimate of the unsettled claims pending as of the time NARCO filed for bankruptcy protection. We also accrued for the estimated value of future NARCO asbestos related claims expected to be asserted against the NARCO Trust. The estimate of future NARCO claims was prepared in 2002, in the same year NARCO filed for bankruptcy protection, using NARCO tort system litigation experience based on a commonly accepted methodology used by numerous bankruptcy courts addressing 524(g) trusts. Accordingly, the estimated value of future NARCO asbestos claims was prepared before there was data on claims filings and payment rates in the NARCO Trust under the Trust Distribution Procedures and also prepared when the stay of all NARCO asbestos claims was in effect (which remained in effect until NARCO emerged from Bankruptcy protection). Some critical assumptions underlying this commonly accepted methodology included claims filing rates, disease criteria and payment values contained in the Trust Distribution Procedures, estimated approval rates of claims submitted to the NARCO Trust and epidemiological studies estimating disease instances. The estimated value of the future NARCO liability reflects claims expected to be asserted against NARCO over a fifteen year period. This projection resulted in a range of estimated liability of $743 million to $961 million. We believe that no amount within this range is a better estimate than any other amount and accordingly, we have recorded the minimum amount in the range. Given the Trust's lack of sufficient claims processing experience since NARCO emerged from bankruptcy protection, it is not yet possible to reliably estimate future claim costs based on actual Trust experience.

108.    The 2017 10-K described the methodology the Company used to accrue for Bendix's asbestos liabilities, which used only a five-year time horizon as a basis for its estimates, as follows:

> Regarding Bendix Friction Materials ("Bendix") asbestos related claims, we accrued for the estimated value of pending claims using average resolution values for the previous five years. We also accrued for the estimated value of future anticipated claims related to Bendix for the next five years based on historic claims filing experience and dismissal rates, disease classifications, and average resolution values in the tort system for the previous five years. ***In light of the uncertainties***

> *inherent in making long-term projections, as well as certain factors unique to friction product asbestos claims, we do not believe that we have a reasonable basis for estimating asbestos claims beyond the next five years.*

(Emphasis added.)

109.    Further demonstrating the peculiarity of the limited five-year horizon that Honeywell based its Bendix-related asbestos liability estimates on is the fact that none of Honeywell's competitors made use of similar methodologies in calculating their asbestos liabilities. For instance, in its annual report on Form 10-K for the fiscal year ended December 31, 2016, The Dow Chemical Company described its methodology for determining asbestos liabilities for one of its subsidiaries as follows:

> Based on a study completed in January 2003 by Analysis, Research & Planning Corporation (now known as Ankura Consulting Group, LLC ("Ankura") as a result of the March 2016 merger of Analysis, Research & Planning Corporation and Ankura), *Union Carbide increased its December 31, 2002 asbestos-related liability for pending and future claims for a 15-year period ending in 2017* to $2.2 billion, excluding future defense and processing costs. Since then, Union Carbide has compared current asbestos claim and resolution activity to the results of the most recent Ankura study at each balance sheet date to determine whether the accrual continues to be appropriate. In addition, Union Carbide has requested Ankura to review Union Carbide's historical asbestos claim and resolution activity each year since 2004 to determine the appropriateness of updating the most recent Ankura study.
>
> \* \* \*
>
> In October 2016, Union Carbide requested Ankura to review its historical asbestos claim and resolution activity and determine the appropriateness of updating its December 2014 study. In response to the request, Ankura reviewed and analyzed asbestos-related claim and resolution data through September 30, 2016. *The resulting study, completed by Ankura in December 2016, provided estimates for the undiscounted cost of disposing of pending and future claims against Union Carbide and Amchem, excluding future defense and processing costs, for both a 15-year period and through the terminal year of 2049.*
>
> *Based on the study completed in December 2016 by Ankura, and Union Carbide's own review of the asbestos claim and resolution activity, it was determined that an adjustment to the accrual was necessary. Union Carbide determined that using the estimate through the terminal year of 2049 was more appropriate due to increasing knowledge and data about the costs to resolve claims and*

*diminished volatility in filing rates.* Using the range in the Ankura December 2016 study, which was estimated to be between $502 million and $565 million for the undiscounted cost of disposing of pending and future claims, Union Carbide increased its asbestos-related liability for pending and future claims through the terminal year of 2049 by $104 million, included in "Asbestos-related charge" in the consolidated statements of income. At December 31, 2016, Union Carbide's asbestos-related liability for pending and future claims was $486 million, and approximately 14 percent of the recorded liability related to pending claims and approximately 86 percent related to future claims.

(Emphasis added.)

110.    In a similar fashion, on May 2, 2016, Owens-Illinois, Inc. filed a current report on

Form 8-K with the SEC reporting that the company had revised its accounting methodology for

asbestos liabilities to consider "all claims without limitation to a specific time period," stating the

following:

Since June 2015, the Company has been engaged in an ongoing dialogue with the staff of the Securities and Exchange Commission ("SEC") concerning how the Company estimates its asbestos-related liability. Beginning in 2003, the Company has estimated its asbestos-related liability based on an annual analysis of how far in the future it could reasonably estimate the number of claims it expected to receive. ***Subsequent to the filing of its 2015 Annual Report, the Company was informed by the SEC staff that they believe that, under the applicable accounting pronouncement, the Company should consider all claims without limitation to a specific time period. In light of these discussions, the Company has concluded , in consultation with the Audit Committee and the Company's independent registered public accounting firm Ernst & Young LLP ("EY"), that its method for estimating its future asbestos-related liability was not consistent with the applicable accounting pronouncement***. With the assistance of an external consultant, and utilizing a model with actuarial inputs, the Company has developed a new method for reasonably estimating its total asbestos-related liability. Using the new model, the Company's total asbestos-related liability, without limitation to a specific time period, is expected to be $806 million as of March 31, 2016. ***This is $295 million higher than the estimation method used previously that used a four year future period.***

In light of the foregoing, the Audit Committee, after consideration of relevant facts and circumstances and after consultation with the Company and EY, concluded on April 28, 2016, that the Company's consolidated financial statements for the years ended December 31, 2015, 2014 and 2013 contained within the Company's 2015 Annual Report should be restated, and that such financial statements previously filed with the SEC, should no longer be relied upon.

(Emphasis added.)

111.    Crown Holdings, Inc.'s annual report on Form 10-K for the fiscal year ended December 31, 2016 described the company's correction to its asbestos liabilities accounting methodology as follows:

> *In 2016, the Company corrected the calculation of its estimated asbestos liability under Accounting Standards Codification (ASC) 450, Contingencies. The Company now calculates its estimated liability without limitation to a specified time period*. The Company assessed the materiality of this correction to prior periods' financial statements in accordance with Securities and Exchange Commission Staff Accounting Bulletin No. (SAB) 99, *Materiality*, and SAB 108, *Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements*, codified in ASC 250, *Presentation of Financial Statements*. The Company concluded that the correction was not material to prior periods and therefore, amendments of previously filed reports are not required.

(Emphasis added.)

112.    In a current report on Form 8-K filed with the SEC by Ingersoll-Rand Company on January 10, 2008, the company disclosed a similar change to its asbestos liability-related accounting practices as follows:

> Prior to the fourth quarter of 2007, the Company recorded a liability (which it periodically updated) for its actual and anticipated future asbestos settlement costs projected seven years into the future. The Company did not record a liability for future asbestos settlement costs beyond the seven-year period covered by its reserve because such costs previously were not reasonably estimable for the reasons detailed below.

> *In the fourth quarter of 2007, the Company again reviewed its history and experience with asbestos-related litigation and determined that it had now become possible to make a reasonable estimate of its total liability for pending and unasserted potential future asbestos-related claims*. This determination was based upon the Company's analysis of developments in asbestos litigation, including the substantial and continuing decline in the filing of non-malignancy claims against the Company, the establishment in many jurisdictions of inactive or deferral dockets for such claims, the decreased value of non-malignancy claims because of changes in the legal and judicial treatment of such claims, increasing focus of the asbestos litigation upon malignancy claims, primarily those involving

mesothelioma, a cancer with a known historical and predictable future annual incidence rate, and the Company's substantial accumulated experience with respect to the resolution of malignancy claims, particularly mesothelioma claims, filed against it.

\* \* \*

***Based on these factors, ARPC calculated a total estimated liability of $755 million for the Company to resolve all pending and unasserted potential future claims through 2053, which is ARPC's reasonable best estimate of the time it will take to resolve asbestos-related claims***. This amount is on a pre-tax basis, not discounted for the time-value of money, and excludes the Company's defense fees (which will continue to be expensed by the Company as they are incurred). After considering ARPC's analysis and the factors listed above, in the fourth quarter of 2007, the Company increased its recorded liability for asbestos claims by $538 million, from $217 million to $755 million.

(Emphasis added.)

113.    Lastly, 3M Company, one of Honeywell's most significant competitors, described its accounting methodology for asbestos liabilities, which based its estimates on an indefinite time horizon, in its quarterly report on Form 10-Q for the fiscal quarter ended June 30, 2011 as follows:

The Company estimates its respirator mask/asbestos liabilities, including the cost to resolve the claims and defense costs, by examining: (i) the Company's experience in resolving claims, (ii) apparent trends, (iii) the apparent quality of claims (e.g., whether the claim has been asserted on behalf of asymptomatic claimants), (iv) changes in the nature and mix of claims (e.g., the proportion of claims asserting usage of the Company's mask or respirator products and alleging exposure to each of asbestos, silica, coal or other occupational dusts, and claims pleading use of asbestos-containing products allegedly manufactured by the Company), (v) ***the number of current claims and a projection of the number of future asbestos and other claims that may be filed against the Company***, (vi) the cost to resolve recently settled claims, and (vii) an estimate of the cost to resolve and defend against current and future claims.

Developments may occur that could affect the Company's estimate of its liabilities. These developments include, but are not limited to, significant changes in (i) the number of future claims, (ii) the average cost of resolving claims, (iii) the legal costs of defending these claims and in maintaining trial readiness, (iv) changes in the mix and nature of claims received, (v) trial and appellate outcomes, (vi) changes in the law and procedure applicable to these claims, and (vii) the financial viability of other co-defendants and insurers.

(Emphasis added.)

114.    As the Individual Defendants would later admit, the Company's accounting policies with respect to its Bendix-related asbestos liabilities, and specifically the Company's use of a limited five-year time horizon, failed to comply with GAAP, and were therefore misleading.

**Correspondence Between Honeywell, Garrett, and the SEC**

115.    On May 1, 2018, the Company filed a draft registration statement confidentially with the SEC in connection with its planned spin-off of Garrett. The draft registration statement contained historical financial statements prepared by the Company using the same accounting methodology that the Company used to determine its Bendix-related liabilities, and included $616 million as of December 31, 2017 in Bendix-related asbestos liabilities.

116.    In a series of letters issued between May 2018 and August 2018, which were not released to the public until October 2018, the SEC inquired into the asbestos liability figures Honeywell provided, as well as Honeywell's related accounting practices.

117.    First, on May 24, 2018, the SEC's Division of Corporation Finance sent a letter to non-party Su Ping Lu, Garrett's then-president and sole director, as well as to non-party John C. Kennedy, the Company's corporate counsel, stating that the Company's accounting practices relating to the Bendix asbestos liabilities seemed to violate ASC 450, and therefore GAAP. The letter stated the following:

> We note your disclosure that the liability for future claims represents the estimated value of future asbestos-related bodily injury claims expected to be asserted against you over the next five years. You say that in light of the uncertainties inherent in making long-term projections, as well as certain factors unique to friction product asbestos claims, you do not believe that you have a reasonable basis for estimating asbestos claims beyond the next five years.
>
> ASC 450 does not provide bright lines with regard to time horizons in which ASC 450 judgments should be considered and applied. ***Therefore, we do not believe there is a conceptual basis for limiting an ASC 450 assessment to a certain time horizon. We believe your ASC 450 assessment should consider all claims without***

*limitation to a specific time period*. It is unclear how the ASC 450 assessment was considered for periods outside of the five year time horizons.

*Based on your history with asbestos claims, it seems unlikely to us that the low end of your range of probable losses for time periods beyond five years is zero*. Therefore, please explain in greater detail how you determined that it was not possible to make any estimate for probable losses (including any legal costs for claims where an accrual has already been provided) for periods beyond five years from the date of the financial statements.

(Emphasis added.)

118.   On June 8, 2018, Garrett and Honeywell sent a letter to the SEC responding to the

SEC's May 24, 2018 inquiry as follows:

Honeywell acknowledges that ASC 450 does not provide bright lines with regard to time horizons in which ASC 450 judgments should be considered and applied. We also acknowledge that epidemiological projections of the incidence of disease extend well beyond a five-year time horizon. However, the incidence of disease does not capture the likelihood either of claims being asserted against Honeywell or of Honeywell incurring a liability. In fact, we believe both are subject to substantial uncertainty due to the nature of Bendix automotive brake linings, emerging scientific research and Honeywell's aggressive litigation strategy. As a result, and based on liability estimates for future claims developed with the assistance of a third party asbestos expert actuarial firm and outside legal counsel, Honeywell selected a five-year future time horizon as the reasonable basis for valuing possible future claims as we believe that any loss or range of loss for probable asbestos claims beyond the five-year period is not reasonably estimable.

* * *

*While Honeywell recognizes that it is probable that there will be asbestos claims filed against Honeywell and that Honeywell will experience losses beyond the five-year period (i.e., in year six), the inherent uncertainty that has resulted from emerging scientific and medical research and from volatility of legal standards in asbestos cases and rulings that we expect to continue have made it difficult to predict asbestos claim rates, settlement values and dismissal rates or to reasonably estimate any loss amount, or range of loss, for such claims beyond a five-year period.*

* * *

As of December 31, 2017, we have accrued $616 million of liability in connection with Bendix related asbestos representing the estimated liability for pending claims as well as future claims expected to be asserted over the next five years. While we believe that the amount of any loss, or range of loss, for future Bendix asbestos

claims beyond the five-year period is not reasonably estimable due to ongoing scientific research and Honeywell's aggressive litigation strategy, *we acknowledge that it is probable that there will be losses associated with Bendix claims beyond the five-year horizon.*

(Emphasis added.)

119.   On June 21, 2018, the SEC sent a follow-up letter to Honeywell and Garrett demanding further explanations as to the Company's five-year time horizon, stating the following:

We note your response that you cannot reasonably estimate a liability for claims not yet asserted for a period beyond five years because the amount of loss cannot be reasonably estimated. *Please tell us how and why you determined a five year time period to estimate losses for unasserted claims yields reliable estimates but time periods beyond five years cannot be reasonably estimated.* Specifically address how and why you determined trends over longer time periods are not more appropriate.

We note your response that liability estimates for future claims were developed with the assistance of a third party asbestos expert actuarial firm and outside legal counsel and probable asbestos claims beyond the five-year period is not reasonably estimable, although Honeywell recognizes that it is probable that there will be asbestos claims filed against Honeywell and that Honeywell will experience losses beyond the five-year period. *Please tell us whether you (1) attempted to estimate a liability for potential claims beyond the five year period but concluded the resulting estimate of loss (or range) was not reasonable or (2) did not attempt to estimate a liability beyond the five year period because you believed you could not develop a reasonable estimate. If the former, tell us the results of your estimation including your estimated liability (or range thereof) as of December 31, 2017 and why you did not believe the estimate(s) to be reasonable.*

Please quantify for us the amount of the liability at December 31, 2016 that relates to potential claims not yet asserted.

(Emphasis added.)

120.   Honeywell and Garrett responded to the SEC with a letter on June 29, 2018, again citing to scientific developments and factors relating to the Company's "aggressive" litigation strategies as purportedly justifying the use of the Company's five-year time horizon. The letter stated the following:

Honeywell estimates its future liability for asbestos-related claims based upon three significant variables: (a) epidemiological projection of the future incidence of asbestos-related disease; (b) projected claims rates, including number, type and nature of claims filed against Honeywell drawn from Honeywell's recent claims experience; and (c) projected average claim resolution values, by type of claim, drawn from Honeywell's recent claims experience. As described in our response to Comment 1 above, Honeywell believes that two of the three variables (specifically, (b) and (c) above) cannot be reasonably estimated beyond a five-year period.

Notwithstanding this limitation, Honeywell applied variables (b) and (c) to the epidemiological projections in the manner used by Honeywell to calculate estimated losses during the five-year forecasting period spanning 2018-2022. Based on this mathematical extrapolation, such calculation generated an estimated reasonably possible exposure over the full term of the epidemiological projections for potential claims not yet asserted of $1.3 billion as of December 31, 2017.

**However, for the reasons cited throughout this response, Honeywell does not believe that this or any other projection beyond a five-year period provides a reasonable estimate of probable and estimable liabilities given that any such projection would be based on the application of key variables that are unreliable beyond the immediate five-year term and would not give proper effect to the impact of scientific developments and Honeywell's aggressive litigation strategies.**

(Emphasis added.)

121. Once again, following a telephonic conference with representatives of Garrett and Honeywell held on July 25, 2018, on July 27, 2018, the SEC sent Garrett and Honeywell a follow-up letter demanding that the companies provide further support for Honeywell's use of a five-year time horizon as follows:

**Based on your disclosures it appears that over the last 10 years you have had relatively consistent amounts of Bendix liabilities accruals and payouts.** You have represented that during these years you believed that your litigation strategy and scientific information related to your product caused you to believe that after a five year period you could not reasonably estimate the claims that would be filed and the resolution rate for those claims.

Please tell us if you believe that over the last 10 years your litigation strategy, scientific findings or other factors that you may have identified to support a five year IBNR accrual period have significantly reduced the claims filed against you or the resolution rate for those claims. If so, please provide data supporting this conclusion. If not, tell us whether you believe you should consider the fact that in

the past these items have not caused the variability in future claims and resolutions you expected in your determination at each year-end from 2006-2017 and how those items prevented you from making a reasonable estimate beyond the next five years in light of that fact.

***In your June 29, 2018 response to our prior comment 2 of our letter dated June 21, 2018, you note that based on a mathematical extrapolation of projected claims rates and average resolution values, a reasonably possible exposure over the full term of the epidemiological projections for Bendix IBNR claims would be $1.3 billion. We understand that this would represent $820 million of reasonably possible additional exposure beyond what is recorded at December 31, 2017, extending over an approximate 30 year period beginning in 2023.***

Please tell us how much of the incremental $820 million would be included if the IBNR estimate were extended based on this mathematical extrapolation: 1) an additional 5 years (2023-27) and 2) an additional 10 years (2023-32).

***Please provide us the accounting memoranda supporting the conclusion that Bendix related liabilities could not be reasonably estimated beyond a five year time horizon for each of the years ended December 31, 2013 through 2017***.

(Emphasis added.)

122.    On August 8, 2018, by way of a letter to the SEC, Honeywell and Garrett conceded that Honeywell's accounting methodology with respect to Bendix's asbestos liability was improper, and violated GAAP, and disclosed that as a result, a material weakness existed in Garrett's internal controls. The letter stated the following:

Upon thorough and thoughtful consideration of the Staff's comments and of the appropriate application of Accounting Standards Codification 450, Contingencies ("ASC 450"), ***Honeywell has determined that it had not appropriately applied the provisions of ASC 450 when measuring its asbestos liabilities related to unasserted Bendix claims. Specifically, Honeywell concluded that the appropriate application of ASC 450 with respect to unasserted Bendix-related asbestos claims is to reflect the full term of the epidemiological projections in its measurement of such liability.***

As a result of the foregoing, Honeywell plans to revise its historical consolidated financial statements in future filings to reflect the full term of the epidemiological projections in its measurement of liability for unasserted Bendix-related asbestos claims. While immaterial to Honeywell, this planned revision of Honeywell's historical consolidated financial statements has resulted in a restatement of the Company's historical Combined Financial Statements. Among other things,

Amendment No. 2 reflects this restatement as well as a discussion of the material weakness in the Company's internal control over financial reporting that accompanied the restatement.

(Emphasis added.)

123.    That same day, Garrett filed an amendment to its draft registration statement with the SEC, which stated the following:

In August 2018, the Transportation Systems business ("TS," the "Business," the "Company," "we" or "our") of Honeywell International Inc. ("Honeywell" or the "Parent") determined that it had not appropriately applied the provisions of ASC 450, Contingencies, in measuring its asbestos liabilities related to unasserted Bendix claims (see Note 18 Commitments and Contingencies). The Company now reflects the full term of the epidemiological projections rather than a five-year time horizon when estimating the liability for unasserted Bendix-related asbestos claims.

***In light of the foregoing, the Company has restated the financial statements as of and for the years ended December 31, 2017, 2016, and 2015 to reflect the effects of its revised method for estimating its total liability for unasserted Bendix-related asbestos claims and to make certain corresponding disclosures related thereto***.

\* \* \*

Our financial statements are derived from the consolidated financial statements and accounting records of Honeywell. In the course of preparing for our Spin-Off from Honeywell, Honeywell reassessed its accounting for unasserted Bendix-related asbestos claims to reflect the full term of the epidemiological projections in its measurement of such liability.

Specifically, after assessing the deficiency that allowed the error to occur, and after assessing the materiality of the error to the Company's Combined Financial Statements, it was determined that there were not effective controls in place to provide reasonable assurance that a material error would be prevented or detected related to the application of ASC 450 (Contingencies) in the estimation of such Bendix-related asbestos liability.

124.    As such, whereas Garrett restated each of its financial statements for its 2015, 2016, and 2017 fiscal years, Honeywell only eventually restated its financial statements for its 2017 fiscal year, based on those same facts.

125.    As described in more detail below, on August 14, 2018, the SEC sent a letter to Honeywell regarding its review of Honeywell's financial statements, stating the following:

> We note that you estimate your Bendix and NARCO asbestos related liabilities for future claims based on specific time periods subsequent to your balance sheet date. Please explain why you use different time periods for estimating the liabilities for future asbestos claims for your Bendix products asbestos liability and your NARCO- related asbestos liability. ***In your response, also please provide us with an analysis that explains your facts and circumstances as well as your basis under ASC 450 to use those specific future time periods.***

(Emphasis added.)

126.    Subsequently, as also described in more detail below, on August 20, 2018, Honeywell's Vice President and Controller, non-party John J. Tus ("Tus") sent a letter to the SEC in response to its August 14, 2018 letter. In the letter, the Company admitted, among other things, that Honeywell's accounting methodology with respect to Bendix's asbestos liabilities violated ASC 450. The letter stated the following, in relevant part:

> Upon thorough consideration of the Staff's comments in its review of the Form 10 submitted to the Staff in connection with the proposed spin- off of Garrett Motion Inc. and of the application of ASC 450, ***Honeywell determined that we had not appropriately applied the provisions of ASC 450 when measuring asbestos liabilities related to unasserted Bendix claims. Specifically, we concluded that the appropriate application of ASC 450-20 with respect to unasserted Bendix-related asbestos claims is to reflect the full term of the epidemiological projections in the measurement of such liability***. The Company intends to revise its historical consolidated financial statements in future filings to reflect the inclusion of the full term of the epidemiological projections (through 2059) in its measurement of liability for unasserted Bendix-related asbestos claims.

(Emphasis added.)

### The Individual Defendants' Duty to Disclose

127.    Under applicable SEC rules and regulations, public companies, such as Honeywell, are required to file financial statements that are prepared in accordance with GAAP. SEC

Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) provides that financial statements that are not in compliance with GAAP are to be presumed misleading.

128.    The SEC recognizes the Financial Accounting Standards Board ("FASB"), as the authoritative source for GAAP. The FASB publishes GAAP in the ASC.

129.    ASC 450, *Contingencies*, provides the standards for disclosing loss and gain contingencies. ASC 450 lists several examples of loss contingencies, including "[a]ctual or possible claims and assessments," and "[p]ending or threatened litigation." ASC 450-20.

130.    ASC 450 provides that a loss contingency must be disclosed if the contingency is reasonably possible, or "more than remote but less than likely." ASC 450-20-50.

131.    ASC 450 further provides that a loss contingency "shall be accrued by a charge to income" if the loss is probable and the amount "can be reasonably estimated." ASC 450-20-25.

132.    ASC 450 notes that the same standards for disclosure of contingent liabilities apply to both asserted claims and unasserted claims, stating, "[w]ith respect to unasserted claims and assessments, an entity must determine the degree of probability that a suit may be filed or a claim or assessment may be asserted and the possibility of an unfavorable outcome. If an unfavorable outcome is probable and the amount of loss can be reasonably estimated, accrual of a loss is required." ASC 450-20-55.

133.    ASC 450 also requires that "[i]f some amount within a range of loss appears at the time to be a better estimate than any other amount within the range, that amount shall be accrued," and that "[w]hen no amount within the range is a better estimate than any other amount, however, the minimum amount in the range shall be accrued." ASC 450-20-30.

134.    As such, and as the Individual Defendants would later admit, the Company's accounting policies with respect to its Bendix-related asbestos liabilities failed to comply with the

provisions of ASC 450, as the Individual Defendants possessed the necessary information to estimate asbestos liability beyond the limited five-year horizon that the Company provided in its financial statements, yet declined to do so.

135.    SEC Regulation S-K imposes certain affirmative disclosure requirements on publicly traded companies with respect to their finances and operations. Specifically, Item 103 of Regulation S-K requires public companies to disclose any material legal proceedings facing such companies, or material proceedings contemplated by government authorities, stating the following:

> Describe briefly any material pending legal proceedings, other than ordinary routine litigation incidental to the business, to which the registrant or any of its subsidiaries is a party or of which any of their property is the subject. Include the name of the court or agency in which the proceedings are pending, the date instituted, the principal parties thereto, a description of the factual basis alleged to underlie the proceeding and the relief sought. ***Include similar information as to any such proceedings known to be contemplated by governmental authorities.***

(Emphasis added.)

136.    As such, the Individual Defendants had a duty pursuant to Regulation S-K to disclose the SEC's inquiry, because, due to the serious nature of the inquiry, and the substantial amount of correspondence exchanged between the Company and the SEC, the Individual Defendants must have been aware that the SEC was contemplating bringing a material legal proceeding against the Company.

**False and Misleading Statements**

***February 9, 2018 Form 10-K***

137.    On February 9, 2018, the Company filed its 2017 10-K with the SEC. The 2017 10-K was signed by Defendants Adamczyk, Szlosek, Cote, Ayer, Burke, Davis, Deily, Gregg, Hollick, Lieblein, Pardo, Paz, and Washington, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by

Defendant Adamczyk and Szlosek attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

138.    The 2017 10-K reported net income of $1.655 billion attributed to Honeywell, as well as $2.177 billion in comprehensive income.

139.    In its section on "Commitments and Contingencies," the 2017 10-K provided a chart detailing Honeywell's Bendix-related asbestos liabilities. The chart reported $616 million in asbestos liabilities, among other things, stating the following:

**Asbestos Related Liabilities**

| | Year Ended December 31, 2017 | | | Year Ended December 31, 2016 | | | Year Ended December 31, 2015 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Bendix | NARCO | Total | Bendix | NARCO | Total | Bendix | NARCO | Total |
| Beginning of year | $ 641 | $919 | $ 1,560 | $ 622 | $921 | $1,543 | $ 623 | $929 | $1,552 |
| Accrual for update to estimated liability | 199 | 31 | 230 | 203 | 9 | 212 | 180 | 8 | 188 |
| Change in estimated cost of future claims | (4) | — | (4) | 13 | — | 13 | 11 | — | 11 |
| Update of expected resolution values for pending claims | 3 | — | 3 | 4 | — | 4 | 1 | — | 1 |
| Asbestos related liability payments | (223) | (43) | (266) | (201) | (11) | (212) | (193) | (16) | (209) |
| End of year | $ 616 | $907 | $1,523 | $ 641 | $919 | $1,560 | $ 622 | $921 | $1,543 |

140.    The 2017 10-K also discussed the Company's methods of determining Bendix's asbestos liabilities as follows:

> Our consolidated financial statements reflect an estimated liability for resolution of pending (claims actually filed as of the financial statement date) and future Bendix-related asbestos claims. We have valued Bendix pending and future claims using average resolution values for the previous five years. We update the resolution values used to estimate the cost of Bendix pending and future claims during the fourth quarter each year.

> The liability for future claims represents the estimated value of future asbestos related bodily injury claims expected to be asserted against Bendix over the next five years. Such estimated cost of future Bendix-related asbestos claims is based on historic claims filing experience and dismissal rates, disease classifications, and resolution values in the tort system for the previous five years. *In light of the*

*uncertainties inherent in making long-term projections, as well as certain factors unique to friction product asbestos claims, we do not believe that we have a reasonable basis for estimating asbestos claims beyond the next five years.* The methodology used to estimate the liability for future claims is similar to that used to estimate the liability for future NARCO-related asbestos claims.

Our insurance receivable corresponding to the liability for settlement of pending and future Bendix asbestos claims reflects coverage which is provided by a large number of insurance policies written by dozens of insurance companies in both the domestic insurance market and the London excess market. Based on our ongoing analysis of the probable insurance recovery, insurance receivables are recorded in the financial statements simultaneous with the recording of the estimated liability for the underlying asbestos claims. This determination is based on our analysis of the underlying insurance policies, our historical experience with our insurers, our ongoing review of the solvency of our insurers, judicial determinations relevant to our insurance programs, and our consideration of the impacts of any settlements reached with our insurers.

Honeywell believes it has sufficient insurance coverage and reserves to cover all pending Bendix-related asbestos claims and Bendix-related asbestos claims estimated to be filed within the next five years. Although it is impossible to predict the outcome of either pending or future Bendix-related asbestos claims, we do not believe that such claims would have a material adverse effect on our consolidated financial position in light of our insurance coverage and our prior experience in resolving such claims. If the rate and types of claims filed, the average resolution value of such claims and the period of time over which claim settlements are paid (collectively, the Variable Claims Factors) do not substantially change, Honeywell would not expect future Bendix-related asbestos claims to have a material adverse effect on our results of operations or operating cash flows in any fiscal year. No assurances can be given, however, that the Variable Claims Factors will not change.

(Emphasis added.)

141.   The 2017 10-K stated the following regarding the Company's internal controls:

Honeywell management maintains disclosure controls and procedures designed to provide reasonable assurance that information required to be disclosed in reports filed under the Securities Exchange Act of 1934, as amended (Exchange Act) is recorded, processed, summarized and reported within the specified time periods and accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosure. *There have been no changes that have materially affected, or are reasonably likely to materially affect, Honeywell's internal control over financial reporting that have occurred during the quarter ended December 31, 2017.*

Our management, with the participation of our CEO and CFO, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) or 15d-15(e) promulgated under the Exchange Act) at December 31, 2017. **Based on these evaluations, our CEO and CFO concluded that our disclosure controls and procedures required by paragraph (b) of Rules 13a-15 or 15d-15 were effective as of December 31, 2017.**

(Emphasis added.)

### March 8, 2018 Proxy Statement

142.    On March 8, 2018, the Company filed a Schedule 14A with the SEC (the "2018 Proxy Statement"). Defendants Adamczyk, Angove, Ayer, Burke, Davis, Deily, Gregg, Hollick, Lieblein, Pardo, Paz, and Washington solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[2]

143.    With respect to the Company's Code of Conduct, the 2018 Proxy Statement stated, "Honeywell's Code of Business Conduct applies to all directors, officers (including the Chief Executive Officer, Chief Financial Officer and Controller) and employees."

144.    The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

145.    The 2018 Proxy Statement also called for stockholders to reject two stockholder proposals—one proposing the requirement that whenever possible, the Chairman of the Board be

---

[2] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

49

an independent director, and the other proposing that the Company disclose its political lobbying payments and policies.

146.    The 2018 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company had engaged in improper accounting methods in order to conceal the true extent of Bendix's asbestos liabilities, in violation of ASC 450; (2) the Company was able to estimate potential liability arising from Bendix-related asbestos claims more than five years into the future, contrary to the Individual Defendants' representations; (3) as a result of the foregoing, the Company's net income and comprehensive income were artificially inflated, and the Company's financial statements were inaccurate and were not in compliance with GAAP or relevant industry norms; (4) as a further result of the foregoing, the SEC would inquire into the Company's accounting practices related to Bendix's asbestos liabilities, which would ultimately lead to a full-blown investigation; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

147.    As a result of the material misstatements and omissions contained in the 2018 Proxy Statement, Company shareholders rejected the stockholder proposals regarding an independent Board Chairman and disclosure of the Company's lobbying payments and policies.

### *April 20, 2018 Form 10-Q*

148.    On April 20, 2018, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2018 with the SEC (the "1Q18 10-Q"). The 1Q18 10-Q was signed by the Company's Vice President and Controller, non-party Jennifer H. Mak, and contained SOX certifications signed by Defendants Adamczyk and Szlosek attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's

internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

149.    In its "Commitments and Contingencies" section, the 1Q18 10-Q reported $616 million in Bendix-related asbestos liabilities as of December 31, 2017, as well as $615 million as of March 31, 2018, providing the following chart:

**Asbestos Related Liabilities**

|  | Bendix | NARCO | Total |
|---|---|---|---|
| December 31, 2017 | $      616 | $      907 | $    1,523 |
| Accrual for update to estimated liability | 47 | 0 | 55 |
| Asbestos related liability payments | (48) | (2) | (50) |
| March 31, 2018 | $      615 | $      913 | $    1,528 |

150.    Similarly to the 2017 10-K, the 1Q18 10-Q also discussed the Company's methods of determining Bendix's asbestos liabilities as follows:

Our consolidated financial statements reflect an estimated liability for resolution of pending (claims actually filed as of the financial statement date) and future Bendix-related asbestos claims. We have valued Bendix pending and future claims using average resolution values for the previous five years. We update the resolution values used to estimate the cost of Bendix pending and future claims during the fourth quarter each year.

The liability for future claims represents the estimated value of future asbestos related bodily injury claims expected to be asserted against Bendix over the next five years. Such estimated cost of future Bendix-related asbestos claims is based on historic claims filing experience and dismissal rates, disease classifications, and resolution values in the tort system for the previous five years. *In light of the uncertainties inherent in making long-term projections, as well as certain factors unique to friction product asbestos claims, we do not believe that we have a reasonable basis for estimating asbestos claims beyond the next five years*. The methodology used to estimate the liability for future claims is similar to that used to estimate the liability for future NARCO-related asbestos claims.

Our insurance receivable corresponding to the liability for settlement of pending and future Bendix asbestos claims reflects coverage which is provided by a large number of insurance policies written by dozens of insurance companies in both the domestic insurance market and the London excess market. Based on our ongoing analysis of the probable insurance recovery, insurance receivables are recorded in the financial statements simultaneous with the recording of the estimated liability for the underlying asbestos claims. This determination is based on our analysis of

the underlying insurance policies, our historical experience with our insurers, our ongoing review of the solvency of our insurers, judicial determinations relevant to our insurance programs, and our consideration of the impacts of any settlements reached with our insurers.

Honeywell believes it has sufficient insurance coverage and reserves to cover all pending Bendix-related asbestos claims and Bendix-related asbestos claims estimated to be filed within the next five years. Although it is impossible to predict the outcome of either pending or future Bendix-related asbestos claims, we do not believe that such claims would have a material adverse effect on our consolidated financial position in light of our insurance coverage and our prior experience in resolving such claims. If the rate and types of claims filed, the average resolution value of such claims and the period of time over which claim settlements are paid (collectively, the Variable Claims Factors) do not substantially change, Honeywell would not expect future Bendix-related asbestos claims to have a material adverse effect on our results of operations or operating cash flows in any fiscal year. No assurances can be given, however, that the Variable Claims Factors will not change.

(Emphasis added.)

151.   The 1Q18 10-Q stated the following regarding the Company's internal controls:

Honeywell management, including the Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) or 15d-15(e) promulgated under the Securities Exchange Act of 1934, as amended (Exchange Act)) as of the end of the period covered by this Quarterly Report on Form 10-Q. ***Based upon that evaluation, the Chief Executive Officer and the Chief Financial Officer concluded that such disclosure controls and procedures were effective as of the end of the period covered by this Quarterly Report on Form 10-Q*** to ensure information required to be disclosed in the reports that Honeywell files or submits under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the Securities and Exchange Commission rules and forms, and that it is accumulated and communicated to our management, including our Chief Executive Officer, our Chief Financial Officer, and our Controller, as appropriate, to allow timely decisions regarding required disclosure. ***There have been no changes that have materially affected, or are reasonably likely to materially affect, Honeywell's internal control over financial reporting that have occurred during the period covered by this Quarterly Report on Form 10-Q***.

(Emphasis added.)

***July 20, 2018 Form 10-Q***

152.    On July 20, 2018, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended June 30, 2018 with the SEC (the "2Q18 10-Q"). The 2Q18 10-Q was signed by Tus, and contained SOX certifications signed by Defendants Adamczyk and Szlosek attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

153.    In its "Commitments and Contingencies" section, the 2Q18 10-Q reported $616 million in Bendix-related asbestos liabilities as of December 31, 2017, as well as $610 million as of June 30, 2018, providing the following chart:

**Asbestos Related Liabilities**

|  | Bendix | NARCO | Total |
|---|---|---|---|
| December 31, 2017 | $ 616 | $ 907 | $ 1,523 |
| Accrual for update to estimated liability | 92 | 19 | 111 |
| Asbestos related liability payments | (98) | (8) | (106) |
| June 30, 2018 | $ 610 | $ 918 | $ 1,528 |

154.    Similarly to the 2017 10-K, the 2Q18 10-Q also discussed the Company's methods of determining Bendix's asbestos liabilities as follows:

> Our consolidated financial statements reflect an estimated liability for resolution of pending (claims actually filed as of the financial statement date) and future Bendix-related asbestos claims. We have valued Bendix pending and future claims using average resolution values for the previous five years. We update the resolution values used to estimate the cost of Bendix pending and future claims during the fourth quarter each year.
>
> The liability for future claims represents the estimated value of future asbestos related bodily injury claims expected to be asserted against Bendix over the next five years. Such estimated cost of future Bendix-related asbestos claims is based on historic claims filing experience and dismissal rates, disease classifications, and resolution values in the tort system for the previous five years. ***In light of the uncertainties inherent in making long-term projections, as well as certain factors unique to friction product asbestos claims, we do not believe that we have a reasonable basis for estimating asbestos claims beyond the next five years***. The methodology used to estimate the liability for future claims is similar to that used to estimate the liability for future NARCO-related asbestos claims.

Our insurance receivable corresponding to the liability for settlement of pending and future Bendix asbestos claims reflects coverage which is provided by a large number of insurance policies written by dozens of insurance companies in both the domestic insurance market and the London excess market. Based on our ongoing analysis of the probable insurance recovery, insurance receivables are recorded in the financial statements simultaneous with the recording of the estimated liability for the underlying asbestos claims. This determination is based on our analysis of the underlying insurance policies, our historical experience with our insurers, our ongoing review of the solvency of our insurers, judicial determinations relevant to our insurance programs, and our consideration of the impacts of any settlements reached with our insurers.

Honeywell believes it has sufficient insurance coverage and reserves to cover all pending Bendix-related asbestos claims and Bendix-related asbestos claims estimated to be filed within the next five years. Although it is impossible to predict the outcome of either pending or future Bendix-related asbestos claims, we do not believe that such claims would have a material adverse effect on our consolidated financial position in light of our insurance coverage and our prior experience in resolving such claims. If the rate and types of claims filed, the average resolution value of such claims and the period of time over which claim settlements are paid (collectively, the Variable Claims Factors) do not substantially change, Honeywell would not expect future Bendix-related asbestos claims to have a material adverse effect on our results of operations or operating cash flows in any fiscal year. No assurances can be given, however, that the Variable Claims Factors will not change.

(Emphasis added.)

155.    The 2Q18 10-Q stated the following regarding the Company's internal controls:

Honeywell management, including the Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) or 15d-15(e) promulgated under the Securities Exchange Act of 1934, as amended (Exchange Act)) as of the end of the period covered by this Quarterly Report on Form 10-Q. *Based upon that evaluation, the Chief Executive Officer and the Chief Financial Officer concluded that such disclosure controls and procedures were effective as of the end of the period covered by this Quarterly Report on Form 10-Q* to ensure information required to be disclosed in the reports that Honeywell files or submits under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the Securities and Exchange Commission rules and forms, and that it is accumulated and communicated to our management, including our Chief Executive Officer, our Chief Financial Officer, and our Controller, as appropriate, to allow timely decisions regarding required disclosure. *There have been no changes that have materially affected, or are reasonably likely to materially affect, Honeywell's internal control over financial reporting that have occurred during the period covered by this Quarterly Report on Form 10-Q.*

(Emphasis added.)

156.    The statements referenced in ¶¶ 137–141 and 148–155 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company had engaged in improper accounting methods in order to conceal the true extent of Bendix's asbestos liabilities, in violation of ASC 450; (2) the Company was able to estimate potential liability arising from Bendix-related asbestos claims more than five years into the future, contrary to the Individual Defendants' representations; (3) as a result of the foregoing, the Company's income was artificially inflated, and the Company's financial statements were inaccurate and were not in compliance with GAAP or relevant industry norms; (4) as a further result of the foregoing, the SEC would inquire into the Company's accounting practices related to Bendix's asbestos liabilities, which would ultimately lead to a full-blown investigation; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### **The Truth Begins to Emerge**

#### ***August 23, 2018 Form 8-K***

157.    On August 23, 2018, the Company filed a current report on Form 8-K with the SEC revealing that the Company had altered its methodology for estimating Bendix's asbestos liabilities. Specifically, the Form 8-K stated that the Company had begun considering potential Bendix-related asbestos claims through the year 2059 in its liability estimates, rather than basing its estimates on a mere five-year time horizon, as the Company had done previously. The Form 8-K stated the following, in relevant part:

During the course of the Securities and Exchange Commission (SEC) review of the Form 10 filing for the planned spin-off of its Transportation Systems business, Garrett Motion Inc. ("Garrett"), Honeywell International Inc. ("Honeywell", the "Company" or "We") has been engaged in discussions with the staff of the SEC (the "Staff") regarding Garrett's accounting for its liability for unasserted Bendix-related asbestos claims and, in conjunction therewith, reviewed the accounting treatment of its legacy Bendix asbestos liabilities. The Staff's comments related to Garrett's accounting in this area are also applicable to Honeywell's historical financial statements.

**Following these discussions, the Company revised its accounting related to the time period associated with the determination of appropriate accruals for the legacy Bendix asbestos-related liability for unasserted claims in accordance with Accounting Standards Codification 450, Contingencies ("ASC 450"). The prior accounting treatment, disclosed in our footnotes to our historical financial statements, applied a five-year time horizon; the revised treatment reflects the full term of epidemiological projections through 2059.** The change was made in consideration of a number of factors, **including the subjective nature of applying a five-year or any other fixed time horizon when estimating liability for unasserted claims, recent changes by several other registrants to accrue for unasserted asbestos claims over the full term of the epidemiological projections and the desire to facilitate comparability among Honeywell, Garrett and their respective peers**.

Our consolidated balance sheets, consolidated statements of operations, consolidated statements of comprehensive income, consolidated statements of shareholders' equity, and consolidated statements of cash flows relative to prior periods will be immaterially revised to correct the Company's application of ASC 450 with respect to Bendix-related asbestos liabilities. We assessed the materiality of this revision to prior periods' financial statements in accordance with SEC Staff Accounting Bulletin No. 99, *Materiality* ("SAB 99") and SAB 108, *Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements*, codified in ASC 250, *Presentation of Financial Statements*. The Company concluded that the revision was not material to any prior period financial statements, and therefore prior periods will be revised when they are presented in reports to be filed for future periods. A summary of these revisions is presented in Exhibit 99 furnished herewith. The accounting revision will have an immaterial positive impact to Honeywell's full-year 2018 earnings per share, but will have no material impact on operating income and no impact to net sales, segment margin, or operating cash flow.

The impact of the above revisions on the Company's previously reported consolidated balance sheets, certain net income and earnings per share information, certain illustrative disclosures regarding the Company's revised Bendix asbestos liability information which will be reflected in the Company's future filings, and

certain disclosures from the Company's press release dated January 26, 2018, are presented in Exhibit 99 furnished herewith.

Honeywell also received a comment from the Staff regarding the Company's estimate of its NARCO-related asbestos liability. ***We have concluded review of our accounting for asbestos-related liabilities, and it has been determined that no change to such estimate is required for any previously reported period.***

(Emphasis added.)

158.   The Form 8-K attached an exhibit ("Exhibit 99") that included a set of revised consolidated balance sheets, which demonstrated the impact of the Company's revised liability estimates to the Company's financial statements. The balance sheets contained a chart which revealed an additional $1.083 billion in asbestos liabilities for the fiscal quarter ended June 30, 2018, as well as an additional $1.087 billion in asbestos liabilities for the 2017 fiscal year, stating the following:

**Asbestos Related Liabilities**

| | Bendix *(in millions)* | | |
| | As Reported | Adjustment | As Revised |
| --- | --- | --- | --- |
| December 31, 2017 | $ 616 | $ 1,087 | $ 1,703 |
| Accrual for update to estimated liability | 92 | (4) | 88 |
| Asbestos related liability payments | (98) | – | (98) |
| June 30, 2018 | $ 610 | $ 1,083 | $ 1,693 |

159.   Exhibit 99 stated the following regarding Bendix-related asbestos liability:

The Company has revised its method for reasonably estimating its liability for unasserted Bendix asbestos-related claims by considering the epidemiological projections through 2059 of future incidence of Bendix asbestos-related disease. ***Using this method, the Company's Bendix asbestos-related liability is estimated to be $1,693 million as of June 30, 2018. This is $1,083 million higher than the Company's prior estimation which applied a five-year horizon when estimating the liability for unasserted Bendix asbestos-related claims***. The Bendix asbestos-related insurance assets are estimated to be $187 million as of June 30, 2018, which is $65 million higher than the Company's prior estimate.

(Emphasis added.)

160.    Additionally, Exhibit 99 provided the following chart detailing the impact of the revised liability estimates to the Company's net income and earnings during prior fiscal years:

| | Years Ended December 31, | | | | | | | | | |
| | *(Dollars in millions, except per share amounts)* | | | | | | | | | |
| | **2017** | | **2016** | | **2015** | | **2014** | | **2013** | |
| **As Reported** | | | | | | | | | | |
| Net income attributable to Honeywell | $ | 1,655 | $ | 4,809 | $ | 4,768 | $ | 4,239 | $ | 3,924 |
| Earnings per share of common stock—basic | $ | 2.17 | $ | 6.29 | $ | 6.11 | $ | 5.40 | $ | 4.99 |
| Earnings per share of common stock—assuming dilution | $ | 2.14 | $ | 6.20 | $ | 6.04 | $ | 5.33 | $ | 4.92 |
| **As Revised** | | | | | | | | | | |
| Net income attributable to Honeywell | $ | 1,545 | $ | 4,812 | $ | 4,771 | $ | 4,262 | $ | 3,922 |
| Earnings per share of common stock—basic | $ | 2.03 | $ | 6.30 | $ | 6.12 | $ | 5.43 | $ | 4.99 |
| Earnings per share of common stock—assuming dilution | $ | 2.00 | $ | 6.21 | $ | 6.04 | $ | 5.36 | $ | 4.92 |

161.    Exhibit 99 also provided a chart illustrating adjustments to the Company's anticipated insurance recoveries for asbestos liabilities:

**Insurance Recoveries for Asbestos Related Liabilities**

| | Bendix | | | | | |
| | *(in millions)* | | | | | |
| | **As Reported** | | **Adjustment** | | **As Revised** | |
| December 31, 2017 | $ | 123 | $ | 68 | $ | 191 |
| Probable insurance recoveries related to estimated liability | | 12 | | (3) | | 9 |
| Insurance receipts for asbestos related liabilities | | (13) | | – | | (13) |
| June 30, 2018 | $ | 122 | $ | 65 | $ | 187 |

***August 23, 2018 Press Release and Conference Call***

162.    Also on August 23, 2018, the Company issued a press release and conducted a conference call with analysts and investors announcing favorable results from the Company's spin-offs of Garrett and Resideo, including indemnification agreements that would purportedly offset spending related to the Company's Bendix-related asbestos liability. The press release stated the following, in relevant part:

> Following the spins, Honeywell will have a simpler, more focused portfolio that operates in fewer end markets as we transform into a software-industrial company. The announced transactions are expected to strengthen Honeywell's already-strong financial position through a combination of one-time dividends and ongoing reimbursements from the spin companies for the majority of Honeywell's environmental and Bendix asbestos payments. On or around the effective date of

each spin, Honeywell will receive one-time dividends from Garrett and Resideo, totaling approximately $3 billion. Honeywell intends to use the proceeds to pay down its debt and repurchase Honeywell shares. In addition, the Company intends to eliminate all of Honeywell's redundant functional, corporate and shared services costs caused by the two transactions by the end of 2019.

***Garrett and Resideo will make payments to Honeywell under separate indemnification and reimbursement agreements that largely offset Honeywell's related legacy liability spending, including the Bendix asbestos liability that arises from the operations of the legacy Transportation Systems business. Under the indemnity agreements, 90% of Honeywell's Bendix asbestos and a subset of its environmental spending (net of 90% of related insurance receipts and certain other recoveries) is expected to be offset by future payments from Garrett and Resideo***. In total, the indemnity agreement payments are expected to offset Honeywell's future legacy liability payments by as much as $315 million in respect of any year once both spins are complete. Assuming $350 million of expense in a year, the offset would be $315 million for such expenses, or approximately $0.40 of earnings per share (based on Honeywell's projected full-year 2018 weighted average share count of 754 million shares).

(Emphasis added.)

163.    During a presentation held during the conference call, the Company reiterated that Garret would cover 90% of the Company's annual spending related to Bendix asbestos liabilities, up to a maximum of $175 million per year.

164.    Though the truth as to the Company's Bendix-related asbestos liabilities had been partially revealed earlier in the day on August 23, 2018, and likely would have negatively impacted the price of the Company's stock, the simultaneously released positive news about the Company's indemnification agreements with Garrett and Resideo relieved investors, and caused the price of the Company's stock to remain steady, for the time being. Conversely, had the disclosures related to the Company's accounting of asbestos liabilities not been released that same day, the news about the indemnification agreements with Garrett and Resideo likely would have caused a substantial increase in the price of the Company's stock.

165.    As an illustration of this point, a Deutsche Bank analyst reporting on the Company's August 23, 2018 disclosures stated, "[w]e were aware that HON RemainCo's environmental/asbestos expenses would be mitigated by annual payments from Garrett/Resideo, but we view today's news as a positive, given that the payments will amount to up to $315m annually, covering ~90% of HON's annual environmental/asbestos expenses (of ~$350m)."

166.    Additionally, a Barclays analyst commenting on the Company's disclosures noted that "[the Company's] profile should be more attractive to industrial investors (especially in light of the ability to 'off-load' environmental and asbestos cash payments)," and explained that "[w]e restate historical HON financials for the accounting change related to Bendix asbestos liabilities and slightly increase 2018 core forecasts….Our price target moves to $178 from $176 to reflect the change in estimates."

### October 10, 2018 Release of SEC Letters

167.    On October 10, 2018, the SEC released to the public the correspondence dated August 14, 2018 and August 20, 2018 between the Company and the SEC's Division of Corporation Finance. The SEC's letter dated August 14, 2018 stated the following, in relevant part:

> We note that you estimate your Bendix and NARCO asbestos related liabilities for future claims based on specific time periods subsequent to your balance sheet date. Please explain why you use different time periods for estimating the liabilities for future asbestos claims for your Bendix products asbestos liability and your NARCO-related asbestos liability. ***In your response, also please provide us with an analysis that explains your facts and circumstances as well as your basis under ASC 450 to use those specific future time periods***. To the extent you determine that the specific future time periods used were incorrect, please provide us with a materiality analysis and your assessment of whether there was a material weakness in internal controls over financial reporting.
>
> We remind you that the company and its management are responsible for the accuracy and adequacy of their disclosures, notwithstanding any review, comments, action or absence of action by the staff.

(Emphasis added.)

168.     The August 20, 2018 letter, which was written by Tus in response to the SEC's

August 14, 2018 letter, stated the following, in relevant part:

> We have used different methodologies for estimating asbestos-related liabilities for Bendix and for the NARCO Trust due to the significant distinctions in claims data and histories between the two sets of asbestos-related liabilities.  Due to the inherent complexities of modeling numerous layers of uncertain inputs, Honeywell continues to believe that it is critical to retain outside asbestos liability valuation expertise to support our preparation of liability estimates.   The fundamental difference between estimating liability for Bendix and the NARCO Trust is the availability of a robust quantity and quality of information (or in the NARCO Trust case, the lack thereof) that has been available for us to use when attempting to make reasonable estimates of our contingent liability.  This is critical to understanding why we have used different methods to determine our reasonable estimates, for ASC 450-20 purposes, of our Bendix-related asbestos and NARCO Trust-related asbestos liabilities.  We outline below the facts and circumstances behind each of Bendix and the NARCO Trust to clearly differentiate the two and to explain why we have handled the accounting estimates in two different ways.  ***As described in more detail below and in the Appendices hereto, we are proposing to change our accounting treatment for Bendix asbestos-related liabilities to a terminal value time horizon***.  We also discuss our materiality analysis related to that revision and our conclusion that the revision we intend to make does not indicate a material weakness in our internal control over financial reporting.  For NARCO Trust asbestos-related liabilities, we believe based on the absence of reliable claims data, that our current projection of liability is correct as it is the best available estimate and have described in detail our process and position based on the available facts.

> \* \* \*

> ***Upon thorough consideration of the Staff's comments in its review of the Form 10 submitted to the Staff in connection with the proposed spin-off of Garrett Motion Inc. and of the application of ASC 450, Honeywell determined that we had not appropriately applied the provisions of ASC 450 when measuring asbestos liabilities related to unasserted Bendix claims***.  Specifically, we concluded that the appropriate application of ASC 450-20 with respect to unasserted Bendix-related asbestos claims is to reflect the full term of the epidemiological projections in the measurement of such liability.  The Company intends to revise its historical consolidated financial statements in future filings to reflect the inclusion of the full term of the epidemiological projections (through 2059) in its measurement of liability for unasserted Bendix-related asbestos claims.

> It is important to note that, unlike the NARCO Trust, Bendix claims have been addressed through the tort system since the mid-1970s, creating a body of historical

claims information on which to rely when estimating a future projection of liability.  Each year, we have a substantial body of real-time data of claims asserted, dismissal rates and resolution values that is more than sufficiently robust to support reliable estimates.  ***The robustness of this data supported our conclusion that application of the claims data to the full term of the epidemiological projections yields a probable and reasonably estimable projection of liability under ASC 450***.

(Emphasis added.)

169.   The Company's August 20, 2018 letter to the SEC also included an appendix ("Appendix A") containing additional disclosures relating to the Company's accounting of Bendix-related asbestos liabilities. Appendix A revealed that the Company's management had determined that a significant deficiency existed in Honeywell's internal controls, stating the following:

We assessed the materiality of the revision related to the accounting for our Bendix asbestos liability to prior periods' financial statements in accordance with Securities and Exchange Commission Staff Accounting Bulletin No. 99, *Materiality* ("SAB 99") and SAB 108, *Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements*, codified in ASC 250, *Presentation of Financial Statements*. To determine the materiality of the correction to the revised estimate of the accrual for unasserted claims related to Bendix, management performed an analysis of both quantitative and qualitative factors under both the "rollover" method and the "iron curtain" method.

Additionally, management has evaluated the circumstances around the Bendix asbestos liability error detailed above to determine whether it is an indicator of a material weakness in financial reporting controls. ***Based on the quantitative and qualitative considerations discussed below we concluded we have a significant deficiency and not a material weakness in internal controls over financial reporting related to our determination of the time horizon for the Bendix-related asbestos liability***. Therefore, we did not alter our conclusion as to the effectiveness of internal control over financial reporting as of December 31, 2017, from those disclosed within our December 31, 2017 Annual Report on Form 10-K.

(Emphasis added.)

170.   Appendix A also discussed the Company's improper accounting practices related to Bendix's asbestos liabilities, as well as the impact of such practices on the Company's net

income and comprehensive income, revealing that the Company would be forced to issue a restatement to correct for the errors in its accounting for asbestos liabilities. Appendix A stated the following, in relevant part:

- Under the iron curtain method from a balance sheet perspective, the correction of the error is not quantitatively material to the balance sheet because it does not affect any of the Company's key balance sheet metrics, including equity, by more than 4.5%. The cumulative error represents an increase of $65 million or 15.9% of insurance recoveries, but these amounts are not significant in view of total assets of $59,860 million (an increase of approximately 0.1%). The cumulative error represents an increase of $1,083 million or 91.9% of asbestos related liabilities, but this is non-current in nature and not significant when viewed in relationship to total liabilities of $42,087 million (an increase of 2.6%). It also impacts net deferred tax liabilities by $248 million or 9.0%, but this is also not significant when viewed in relationship to total liabilities of $42,087 million (a decrease of 0.6%). The cumulative error therefore impacts equity by $770 million on an equity balance of $17,773 million (a decrease of approximately 4.4%).

- Under the iron curtain method, the effects of a cumulative correction on the Company's projected 2018 income statement, however, would be material. *For instance, the impact of correcting the error in 2018 would be a charge of (i) $1,018 million to income before taxes, and (ii) $770 million to net income*. This would represent a greater than 10% impact on both of the forecasted 2018 amounts. *Accordingly, we have concluded that the error cannot be corrected through the 2018 income statement and must, therefore be corrected via a revision of prior periods.*

- In order to assess whether the revision for this error represents a material restatement or immaterial restatement (i.e. revision), we utilized the rollover method to quantify the amount by which each affected income statement and statement of cash flows in the last five years was actually misstated, and quarterly periods for the latest two years. Additionally, as part of this analysis, we calculated the cumulative effect of the uncorrected error on the balance sheets at the end of each such period. The rollover method analysis indicates that the restatement is not quantitatively material because the effects of the error on the misstated income statements, statements of cash flows and balance sheets of those prior periods is less than 5% of all key metrics in each period, *with the exception of net income (-6.5%) and comprehensive income (-5.0%) for the year ended December 31, 2017*. This was primarily due to an increase in the Company's tax provision as a result of US Tax Reform enacted in December 2017. The impact of US Tax Reform was considered unusual and infrequent in nature, and furthermore,

the Company has disclosed the effects of tax reform through its earnings releases and periodic financial statements. Excluding the impact of US Tax Reform, the impact of the error on our 2017 net income is $27 million or 0.5%. This error also had no overall impact on cash flows from operations.

(Emphasis added.)

171.    Moreover, Appendix A revealed how far into the future the Company could actually estimate Bendix-related asbestos liabilities, in contrast to the Individual Defendants' prior representations:

> *As indicated previously, in August 2018, management concluded it should adjust the Bendix asbestos liability to reflect the full term of the epidemiological projections through 2059, and therefore, determined that it had historically incorrectly applied the provisions of ASC 450, Contingencies, in measuring its Bendix asbestos liability related to unasserted claims*. This error, and the related control deficiency, were identified during the course of the SEC Staff's review of the Form 10 filing related to Garrett Motion Inc.
>
> Our conclusion to adjust the time horizon of the Bendix liability was made after (i) reevaluating the highly subjective nature of the use of a five-year horizon (when various horizon periods could also be used), (ii) *noting the recent change by numerous companies to accrue for unasserted claims over the full term of the epidemiological studies (again because of such time horizon subjectivity)*, and (iii) *concluding that such an adjustment would facilitate comparability between Honeywell, Garrett Motion Inc., and the companies' respective peers*. Therefore, with the assistance of an external specialist, and utilizing a model with actuarial inputs, Honeywell has and will continue in the future to consider the full term of epidemiological projections of future incidents of asbestos-related disease to estimate its probable and reasonably estimable Bendix asbestos-related liability.

(Emphasis added.)

172.    Appendix A further discussed the deficiencies in the Company's internal controls in greater detail, stating the following:

> *The error that was identified is an indication that a deficiency existed in the operation of an existing internal control since there was a failure to properly apply the key provisions of the control in establishing an estimate of unasserted Bendix asbestos claims liability related to the time horizon for which these claims would be asserted.*

As noted in the summary of the accounting process for unasserted claims above, we use a third-party specialist to assist in assessing the required Bendix unasserted claims liability. The Company has designed a relevant internal control over that process. **_We identified an operating effectiveness deficiency related to that internal control activity_**. The specific control activity is the "Bendix Reserves True-up" control, which states that "…Honeywell's third-party service provider calculates the average resolution values on which Honeywell bases its estimates of the total liability associated with its current and future Bendix asbestos claims. The year-end reserve is updated based on the new average resolution values and is approved by Management." This key control is specific to Bendix-related asbestos reserves where, on an annual basis, the Bendix-related asbestos reserves are adjusted to properly reflect current year estimates regarding both resolution values and estimated future claimants based on anticipated changes in the population of claims. Management reviews the specialist report for reasonableness of the unasserted claims liability and any increase/decrease from the prior year, and discusses with the specialist the significant actuarial inputs and reasons for the increase/decrease. Outside legal counsel specializing in asbestos related claims is also included in those discussions. **_Management has historically, as part of this process, held discussions with the specialist regarding the time horizon used for the estimation of the future unasserted claims_**. Management approves any adjustment to the unasserted claims liability amount based on this analysis and records the appropriate adjustment to the general ledger.

This control focuses on the analysis and validation of the Bendix asbestos unasserted claims liability. Rights and obligation and valuation and allocation assertions are the relevant assertions that the control addresses.

We have not identified any deficiencies in the separate internal control around the monitoring of asbestos claims settlement processing, and related processing of insurance recoveries. That control is the; "Bendix Reserve Adjustments" control and focuses on the review and approval of the recurring periodic adjustments driven by claims settlements and payments. It also includes the analysis of the related insurance recovery receivables. This separate internal control also covers the presentation and disclosure assertion, but is isolated to the specific disclosures in our financial statements for Bendix asbestos matters.  As indicated, no deficiencies were identified in this control for the claims, payment, and insurance recovery controls and related disclosures. The operation of the internal control that was found to be deficient is dependent upon this control given the claims data that is relevant to the analysis.

* * *

Historically, Honeywell determined that it could not compute an accrual for the estimated value of unasserted Bendix asbestos claims that would be reasonably estimable past a five-year horizon. This estimated value included future anticipated claims based on historical claims filing experience and dismissal rates, disease classifications, and average resolution values in the tort system for the previous five

years. When assessing the data used to record the unasserted claims liability, Honeywell, its third-party specialists and its outside legal counsel focused on both historical data and emerging trends and discoveries. Significant weight was placed on the emerging science and studies that indicated the nature and application of the asbestos used in manufactured automotive brake parts by Bendix does not cause disease. Management also focused on evidence suggesting improvements in the tort system with regards to the resolution of asbestos claims (this information and insights having been provided to management by outside counsel). These forward-looking trends were an important input to the analysis. Therefore, Honeywell, along with its third-party specialist and outside legal counsel, concluded that the data available past the five-year horizon was not necessarily indicative or appropriate for use in determining a probable and reasonably estimable future liability for unasserted claims.

Therefore, as part of the operation of the identified deficient Bendix control, a review of the conclusion on the unasserted claims liability occurred in connection with the data analysis and specialist report. ***However, in connection with the performance of this control, the Company inappropriately relied on limited objective and verifiable data to justify its use of a five-year horizon***. The Company had obtained and used the data to properly value a liability, but made the incorrect judgment based on what the data would have otherwise indicated had it not truncated the liability at a five-year horizon. ***The Company did not consider or use all available evidence to evaluate whether they should apply the full term or any other time horizon of epidemiological projections to the liability that might have been more appropriate than a five-year time horizon based on that evidence.***

(Emphasis added.)

173.    Notably, Appendix A also revealed that there was information available to the Individual Defendants hat should have allowed the Individual Defendants to rectify the Company's use of improper accounting practices "at an earlier point," stating the following:

We concluded it was appropriate to revise prior periods when correcting the error under SAB 99. ***This consideration implies that there was information available that should have caused us to modify the time horizon used for the Bendix unasserted claims liability at an earlier point***. The specific time horizon is subjective in nature given the assessment of all available information. This also implies that the body of evidence around this liability, not only internally but externally, had not been fully evaluated and acted upon. We made the adjustment to our financial statements as soon as we recognized these facts based on the "Materiality Assessment" discussed above.  We previously believed that, at the time of the assessment each year, no other projection beyond a five-year period provided a reasonable estimate of probable and estimable liability. This was based on the conclusion that any such projection would be based on the application of key

variables that Honeywell believed were unreliable beyond the immediate five-year
term, primarily because of the weight placed on emerging favorable indicators
around the science and litigation strategies

(Emphasis added.)

174.    Lastly, Appendix A conceded that the Company had "inappropriately relied on a

limited objective and verifiable data" to justify its accounting methods, and that the Individual

Defendants "did not consider all available evidence" in evaluating such methods, thus rendering

the Individual Defendants' prior SOX certifications false and misleading. Appendix A stated the

following:

SOX 404 Assessment Conclusion

Based on the considerations above, we concluded that there was not a material
weakness in internal control. However, we determined that the deficiency is
important enough to merit the attention of those responsible for oversight of the
Company's financial reporting and internal controls, and therefore **Management
concluded that a significant deficiency in internal controls over financial
reporting existed. Specifically, the identified Bendix asbestos control did not
operate effectively because the Company inappropriately relied on limited
objective and verifiable data to justify its use of a five-year horizon. We did not
consider all available evidence to evaluate whether we should apply the full term
of the epidemiological studies**. The Company focused too heavily on the emerging
science and studies that indicated the nature and application of the asbestos used at
Bendix does not cause disease, and on evidence of improvements in the tort system
with regards to resolution of asbestos claims.

We are in the process of remediating the identified significant deficiency by
establishing and documenting a robust policy and controls for the use in
substantiating an accounting estimate that contemplates the full term of the
epidemiological projections based on specific and objectively verifiable data,
including performing a look-back analysis on the payment and claims data, which
will prevent this error from recurring. The deficient control described previously
will continue to require the assistance of a specialist and evaluation of the claims
history, but will now apply that historical data and related assumptions to the full
term of an appropriate epidemiological projections of future incidents of asbestos-
related disease to estimate its probable and reasonably estimable Bendix-related
asbestos-related liability. At this time remediation and the required testing of
control effectiveness have not yet been completed.

(Emphasis added.)

### *October 10, 2018 Press Release and Conference*

175.     The same day the SEC released its correspondence with Honeywell, the Individual

Defendants decided to release certain positive news for the Company in a bid to blunt the impact

of the SEC's disclosures on the Company and its stock price—the same tactic they had previously

employed on August 23,2018. Before the market opened on October 10, 2018, the Company issued

a press release announcing that (1) the Company would be accelerating its spin-off of Resideo,

which would now commence trading on the NYSE on October 29, 2018, and (2) the Company

would be holding an investor conference in New York City on October 10, 2018, the same day the

press release was issued. The press release stated the following, in relevant part:

> Exactly one year after Honeywell (NYSE: HON) announced it would spin off its
> Homes and Global Distribution business, Resideo Technologies, Inc. will host an
> Investor Conference in New York City today. The future stand-alone company will
> showcase its attractive financial profile, growth strategy, and smart home
> technologies. It is anticipated that when-issued trading on the New York Stock
> Exchange in Resideo common stock will begin on or about Monday, Oct. 15.
> On Monday, Oct. 29, Resideo common stock will begin regular-way trading on the
> NYSE under the ticker symbol, "REZI."

176.     During the Company's investor conference, Resideo's executives discussed the

indemnification agreement between Honeywell and Resideo in connection with the Company's

Bendix-related asbestos liabilities. Resideo's CFO, non-party Joseph Ragan, stated that the

indemnification agreement would last for 25 years, that liability under the agreement was limited

to $140 million each year, and that Resideo had already incorporated liability from the agreement

into its financial calculations. Additionally, Resideo's Chief Communications Officer, non-party

Dean Acosta, stated that "[w]e don't manage the remediation. All of that's done by Honeywell."

177.     Analysts focusing on the Company's Resideo-related announcements reacted

positively. For instance, a Barclays analyst reporting on the Company's investor conference noted

the following:

We attended Resideo's inaugural investor meeting in New York earlier today, ahead of its spin out of HON. The spin looks on track to occur later this month…and, along with the completed spinoff of Garrett Motion, should act as a catalyst for HON.

* * *

The indemnification and reimbursement agreement is for 25 years, with a maximum cash payment capped at $140m in any one year (exclusive of any late payment fees up To 5% per year); the payment is the lesser of $140m or 90% of HON's net spend for this. HON retains the liability and is responsible for asbestos management and remediation.

178.    Additionally, a William Blair analyst report commenting on the Company and Resideo's indemnification agreement stated that "Honeywell's free cash flow should be enhanced about 4%-5% annually by effectively transferring about 90% of the annual cost to service Honeywell's $2.4 billion in legacy asbestos and environmental liabilities," and noted that Resideo would "pay Honeywell up to $140 million annually to service its legacy environmental liabilities."

179.    Nonetheless, the price of the Company's stock declined from $155.76 per share at market open on October 10, 2018, to $148.86 per share at the close of trading on October 11, 2018.

**The Truth Fully Emerges**

***October 19, 2018 Form 10-Q***

180.    Finally, on October 19, 2018, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended September 30, 2018 with the SEC (the "3Q18 10-Q"). The 3Q18 disclosed, among other things, that the Company's revised asbestos-related liability estimates were now $2.61 billion as of December 31, 2017, over a billion dollars higher than Honeywell's previous estimate. The 3Q18 10-Q also revealed to the public, for the first time, that on September 13, 2018, following the SEC's review of the Company, the SEC's Division of Enforcement had opened a formal investigation into the Company and its accounting practices related to asbestos liabilities. The 3Q18 10-Q stated the following, in relevant part:

In the third quarter of 2018, the Company revised its accounting to correct the time period associated with the determination of appropriate accruals for the legacy Bendix asbestos-related liability for unasserted claims. The prior accounting treatment applied a five-year time horizon; *the revised treatment reflects the full term of epidemiological projections through 2059. Previously issued financial statements have been revised for this correction with the following effects: The Company's revised estimated asbestos-related liabilities are now $2,610 million as of December 31, 2017, which is $1,087 million higher than the Company's prior estimate*. The Company's Insurance recoveries for asbestos-related liabilities are estimated to be $503 million as of December 31, 2017, which is $68 million higher than the Company's prior estimate. As of December 31, 2017, the net deferred income taxes impact was $245 million, with a decrease to liabilities and increase to assets, and the cumulative impact on Retained earnings was a decrease of $774 million. For the three and nine months ended September 30, 2017, Cost of services sold increased $5 million and $2 million, Tax expense decreased $2 million and $0 million, and Net income decreased $3 million and $2 million.

This revision followed the Securities and Exchange Commission (SEC) Division of Corporation Finance review of our Annual Report on Form 10-K for 2017, which included review of our prior accounting for liability for unasserted Bendix-related asbestos claims. *On September 13, 2018, following completion of Corporation Finance's review, the SEC Division of Enforcement advised that it has opened an investigation related to this matter. Honeywell intends to provide requested information and otherwise fully cooperate with the SEC staff*.

(Emphasis added.)

181.    On this news, the price of the Company's stock fell from $151.26 per share at market open on October 19, 2018, to $147.88 per share at the close of trading on October 22, 2018, the following trading day. The price of the Company's stock continued to plummet over the course of the next several trading days, falling to $145.93 per share at the close of trading on October 23, 2018, and finally stabilizing at $140.83 per share at the close of trading on October 24, 2018.

182.    Later in the day on October 19, 2018, Reuters published an article titled, "SEC investigates Honeywell for asbestos-accounting," which stated the following:[3]

---

[3]          https://www.reuters.com/article/us-honeywell-intl-investigation-sec/sec-investigates-honeywell-for-asbestos-related-accounting-idUSKCN1MT2Q5 (last visited June 5, 2020).

(Reuters) - Honeywell International Inc (HON.N) said on Friday the U.S. Securities and Exchange Commission had opened an investigation into its accounting for asbestos-related liabilities.

The industrial conglomerate's revised estimate for asbestos-related liabilities was $2.61 billion as of end-2017, some $1.09 billion higher than a prior estimate, a regulatory filing.

The liabilities are related to Bendix Friction Materials, a business previously owned by Honeywell and sold in 2014, which made automotive brake linings containing asbestos.

* * *

The company has also revised its 2017 reported earnings per share lower by 14 cents to $2.00.

183.    Also on October 19, 2018, MarketWatch published an article titled, "Honeywell's stock turns lower after SEC accounting investigation disclosed," which commented on the Company's disclosures as follows:[4]

Shares of Honeywell International Inc. HON, 3.85% took an afternoon dive Friday, after the company disclosed that the Securities and Exchange Commission had opened an investigation into its accounting practices. The stock fell 0.7% in recent trade, after being up as much as 1.6% intraday after the diversified industrial company beat third-quarter earnings expectations. Honeywell said in its quarterly 10-Q filing that after a review of its accounting of accruals for the legacy Bendix asbestos-related liability for unasserted claims, the SEC advised Honeywell on Sept. 13 that an investigation was opened. "Honeywell intends to provide requested information and otherwise fully cooperate with the SEC staff," the company said in a statement. The stock has gained 5.7% over the past three months, while the Dow Jones Industrial Average DJIA, 3.44% has tacked on 1.8%.

**Subsequent Developments**

184.    On October 22, 2018, Garrett filed a Form 8-K with the SEC commenting on Honeywell's October 19, 2018 revelations, and attempting to distance itself from the Company and the Company's use of improper accounting practices as follows:

---

[4]    https://www.marketwatch.com/story/honeywells-stock-turns-lower-after-sec-accounting-investigation-disclosed-2018-10-19 (last visited June 5, 2020).

On Friday, October 19, 2018, Honeywell disclosed in its Quarterly Report on Form 10-Q for the quarter ended September 30, 2018 (the "Honeywell Form 10-Q") that *the Division of Enforcement of the Securities and Exchange Commission (the "SEC") has opened an investigation into Honeywell's prior accounting for liability for unasserted Bendix-related asbestos claims*. In addition, Honeywell noted that it revised certain previously issued financial statements to correct the time period associated with the determination of appropriate accruals for legacy Bendix-asbestos related liability for unasserted claims … Prior to the filing of the Honeywell Form 10-Q with the SEC, management was not aware of the SEC's investigation into Honeywell's prior accounting.

(Emphasis added.)

185.    On February 20, 2019, Garrett issued a press release announcing its fiscal 2018 financial results. The press release noted that Garret was unable to verify the accuracy of certain information provided to Garrett by Honeywell, stating the following:

In the course of preparing our Annual Report on Form 10-K and our Consolidated and Combined Financial Statements for the year ended December 31, 2018, our management determined that there is a material weakness in our internal control over financial reporting relating to the supporting evidence for our liability to Honeywell under the Indemnification and Reimbursement Agreement. *Specifically, we are unable to independently verify the accuracy of the certain information Honeywell provided to us that we used to calculate the amount of our Indemnification Liability*, including information provided in Honeywell's actuary report and the amounts of settlement values and insurance receivables. For instance, Honeywell did not provide us with sufficient information to make an independent assessment of the probable outcome of the underlying asbestos proceedings and whether certain insurance receivables are recoverable.

We are working to obtain additional information about the Indemnification Liability through a dialogue and iterative process with Honeywell. We are still engaged in that process, and it remains a high priority for the Company.

(Emphasis added.)

186.    Subsequently, on March 1, 2019, Garrett filed its annual report on Form 10-K for the fiscal year ended December 31, 2018 with the SEC, which stated the following regarding Honeywell:

It is possible that, in future periods, new information may become available relating to the amount of Honeywell's underlying asbestos-related liability payments and

accounts payable as of December 31, 2018 that could cause the amount of the Indemnification Liability reported on our Consolidated and Combined Balance Sheets in this Annual Report on Form 10-K to change, possibly materially, which could lead to a restatement of our Consolidated and Combined Financial Statements.

If we are unable to remediate this material weakness or if we or our independent registered public accounting firm identify future deficiencies in our internal control over financial reporting that are deemed to be material weaknesses, or in the event of any restatement of our Consolidated and Combined Financial Statements, the market price of shares of common stock could decline and we would be subject to sanctions or investigations by the SEC or other regulatory authorities, which could have a material adverse effect on our results of operations and financial condition.

187.    On April 18, 2019, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2019 with the SEC (the "1Q19 10-Q"). The 1Q19 10-Q commented on Honeywell's discussions with Garrett regarding the indemnification agreement between the two companies, revealing that Garrett had taken the position that the agreement was at least partially unenforceable, stating the following:

Reimbursements associated with the indemnification and reimbursement agreement with a Garrett subsidiary (the "Agreement") were $39 million for the quarter ended March 31, 2019 and offset operating cash outflows incurred by the Company. As the Company records the accruals for matters covered by the indemnification and reimbursement agreement, a corresponding receivable from Garrett for 90 percent of such accrual is also recorded. This receivable amount was $13 million in the quarter ended March 31, 2019. As of March 31, 2019, Other Current Assets and Other Assets includes $169 million and $1,022 million representing the short-term and long-term portion of the receivable amount due from Garrett under the indemnification and reimbursement agreement.

***In our ongoing communications with Garrett with respect to the Agreement and Garrett's associated material weakness disclosure in its Form 10-K for the year ended December 31, 2018, Garrett has taken the position that (i) Honeywell has not satisfied all of its obligations under the Agreement, and (ii) the Agreement is unenforceable either in whole or in part***. We strongly believe that Garrett's allegations have no merit, nor are they material to Honeywell. We believe we have fully complied with our obligations under the Agreement and that the Agreement is enforceable in its entirety. We intend to continue to have ongoing discussions with Garrett to try to resolve this matter.

(Emphasis added.)

188.     On July 8, 2019, the Company announced that Tus would be resigning from his position as the Company's Vice President and Controller.

189.     On December 2, 2019, Garrett filed the Garrett Action in the Supreme Court of the State of New York, County of New York: Commercial Division. The complaint stated that Garrett sought relief from its "unconscionable" indemnification agreement with Honeywell, stating the following:

> *[T]his action seeks relief from an unenforceable and unconscionable indemnification agreement, which includes illegal covenants and purports to saddle Garrett with over a billion dollars in asbestos liability unrelated to its business.*
>
> Garrett seeks relief, including: (a) declaratory relief; (b) compensatory damages in an amount to be determined at trial; (c) rescission of the Indemnification Agreement; (d) attorneys' fees and costs; and (e) such other and further relief as the Court may deem just and proper.
>
> * * *
>
> This action arises out of Honeywell's spin-off of Garrett in October 2018. The spin was architected and led by Honeywell's CEO, Darius Adamczyk. Honeywell and Adamczyk sought to use the spin to convince the market that Honeywell's legacy Bendix-related asbestos liability, which well exceeded a billion dollars and had saddled the company for decades, would no longer impact Honeywell's balance sheet and future earnings. To do this, Honeywell purported to give itself control over Garrett's strategic decision-making for thirty years through illegal covenants, *and required Garrett to indemnify it for virtually all of Honeywell's legacy asbestos liability— despite the liability being unrelated to Garrett's business.*
>
> * * *
>
> The Indemnification Agreement purports to require Garrett to reimburse Honeywell for 90% of Honeywell's legacy asbestos liability, including Honeywell's legal fees and costs of defending the thousands of asbestos-related claims brought against it each year. The Indemnification Agreement also purports to illegally require Garrett to indemnify Honeywell for punitive damages, e.g., damages meant to punish Honeywell for its reckless disregard for human life, which juries have awarded against Honeywell in multi-million dollar verdicts both before and after the spin. And, while the Indemnification Agreement purports to force Garrett to foot the bill. Honeywell retains full control over managing the claims, including making settlement decisions and decisions on legal spend without any

notice to Garrett even though Garrett allegedly is required to pay 90% of all such amounts back to Honeywell.

Through the Indemnification Agreement, Honeywell also exercises near total control over Garrett's key corporate decisions during the agreement's thirty-year term. Honeywell did this by inserting a set of loan-like covenants into the Indemnification Agreement and providing that, unlike a loan, the Indemnification Agreement cannot be terminated by early repayment. The result is that Honeywell has purportedly granted itself a discretionary veto over foreseeable business decisions, and an effective right to approve—or prevent—any change of control or other strategic transaction for thirty years. ***The resulting agreement is unlawful, so one-sided as to be manifestly unconscionable, and thus unenforceable.***

Because no company would ever voluntarily agree to such an arrangement, Honeywell did not actually negotiate the Indemnification Agreement with Garrett. Instead, Honeywell installed one of its own in-house lawyers (Su Ping Lu) as Garrett's president and sole director for the purpose of forcing these unconscionable terms on Garrett.

\* \* \*

Worse yet, Honeywell has not even performed its minimal obligations under the agreement it wrote for itself. ***Honeywell has denied Garrett's requests for information concerning the liability and the management of it, despite Garrett's rights under the Indemnification Agreement to access such information and its attempts for a year to obtain it.***

\* \* \*

***Garrett seeks relief from this oppressive and unconscionable Indemnification Agreement, which resulted from substantial breaches of fiduciary duty, and, by its very terms, is illegal***. Garrett further seeks relief, including damages, based on Honeywell's material breach of the agreement and Honeywell's misconduct. And to the extent Honeywell has any right to indemnity, Garrett seeks declaratory judgment that Honeywell cannot be indemnified for amounts paid to settle its punitive damages exposure, and that Honeywell must establish its right to indemnity for each and every expense and settlement.

***Garrett expressly reserves the right to name additional individuals and entities as defendants, including additional Honeywell officers and directors***.

(Emphasis added.)

## Repurchases

190.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of over $3.14 billion to repurchase more than 20.6 million shares of its own common stock at artificially inflated prices.

191.    According to the 1Q18 10-Q, during February 2018, the Company purchased approximately 3.93 million shares of its common stock for over $608 million, at an average price of $154.80 per share.

192.    As the Company's stock was actually worth only $140.83 per share, the price at closing on October 24, 2018, the amount the Company overpaid for repurchases of its own stock during February 2018 was approximately $54.9 million.

193.    According to the 1Q18 10-Q, during March 2018, the Company purchased approximately 2.21 million shares of its common stock for over $332 million, at an average price of $149.80 per share.

194.    As the Company's stock was actually worth only $140.83 per share, the price at closing on October 24, 2018, the amount the Company overpaid for repurchases of its own stock during March 2018 was approximately $19.8 million.

195.    According to the 2Q18 10-Q, during April 2018, the Company purchased approximately 1.22 million shares of its common stock for over $173 million, at an average price of $142.11 per share.

196.    As the Company's stock was actually worth only $140.83 per share, the price at closing on October 24, 2018, the amount the Company overpaid for repurchases of its own stock during April 2018 was approximately $1.56 million.

197.    According to the 2Q18 10-Q, during May 2018, the Company purchased approximately 2.06 million shares of its common stock for over $300 million, at an average price of $145.49 per share.

198.    As the Company's stock was actually worth only $140.83 per share, the price at closing on October 24, 2018, the amount the Company overpaid for repurchases of its own stock during May 2018 was approximately $9.62 million.

199.    According to the 2Q18 10-Q, during June 2018, the Company purchased approximately 1.92 million shares of its common stock for over $289 million, at an average price of $150.59 per share.

200.    As the Company's stock was actually worth only $140.83 per share, the price at closing on October 24, 2018, the amount the Company overpaid for repurchases of its own stock during June 2018 was approximately $18.7 million.

201.    According to the 3Q18 10-Q, during July 2018, the Company purchased approximately 2.6 million shares of its common stock for over $380 million, at an average price of $146.14 per share.

202.    As the Company's stock was actually worth only $140.83 per share, the price at closing on October 24, 2018, the amount the Company overpaid for repurchases of its own stock during July 2018 was approximately $13.8 million.

203.    According to the 3Q18 10-Q, during September 2018, the Company purchased approximately 1.36 million shares of its common stock for over $223 million, at an average price of $163.68 per share.

204.    As the Company's stock was actually worth only $140.83 per share, the price at closing on October 24, 2018, the amount the Company overpaid for repurchases of its own stock during September 2018 was approximately $31.1 million.

205.    According to the Company's annual report on Form 10-K filed with the SEC on February 8, 2019, during October 2018, the Company purchased approximately 5.36 million shares of its common stock for over $840 million, at an average price of $156.75 per share.

206.    As the Company's stock was actually worth only $140.83 per share, the price at closing on October 24, 2018, the amount the Company overpaid for repurchases of its own stock during October 2018 was approximately $85.3 million.

207.    Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by over $235 million.

## DAMAGES TO HONEYWELL

208.    As a direct and proximate result of the Individual Defendants' conduct, Honeywell will lose and expend many millions of dollars.

209.    Such losses include over $235 million the Company overpaid when it repurchased its own common stock at artificially inflated prices during the Relevant Period before the fraud was exposed.

210.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its CEO, its CFO, and its former CFO, as well as the Garrett Action filed against the Company and its CEO, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

211.    These expenditures also include any fees associated with the SEC's investigation into the Company's use of improper accounting practices in connection with Bendix's asbestos liabilities, and the Company's internal investigation in connection thereto.

212.    Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

213.    Such expenditures further include costs associated with restating certain of the Company's historical financial statements pursuant to the Company's revised accounting methodology for Bendix's asbestos liabilities.

214.    As a direct and proximate result of the Individual Defendants' conduct, Honeywell has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

215.    Plaintiff brings this action derivatively and for the benefit of Honeywell to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Honeywell, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

216.    Honeywell is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

217.    Plaintiff is, and has been at all relevant times, a shareholder of Honeywell.  Plaintiff will adequately and fairly represent the interests of Honeywell in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

218.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

219.    A pre-suit demand on the Board of Honeywell is futile and, therefore, excused.  At the time of filing of this complaint, the Board consists of the following thirteen individuals: Defendants Adamczyk, Angove, Ayer, Burke, Davis, Deily, Gregg, Hollick, Lieblein, Paz, and Washington (the "Director-Defendants"), along with non-parties Deborah Flint and Raymond T. Odierno (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to seven of the thirteen Directors that were on the Board at the time of the filing of this complaint.

220.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to cause the Company to engage in improper accounting practices, to make and/or cause the Company to make false and misleading statements and omissions of material fact while one of them engaged in insider sales based on material non-public information, and, at the same time, to cause the Company to overpay by over $235 million for repurchases of its own stock, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

221.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in causing the Company to engage in improper accounting practices and in making and/or causing the Company to make the materially false and misleading statements alleged herein.  The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors.   While investors were duped into believing the fraud perpetrated by the Individual Defendants, one of the Directors sold Company stock at artificially inflated prices based on inside information.  As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

222.    Additional reasons that demand on Defendant Adamczyk is futile follow. Defendant Adamczyk has served as the Company's Chairman and CEO since April 2018. He previously served as President and CEO from March 2017 to April 2018, and as Chief Operating Officer from April 2016 to March 2017. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Adamczyk with his principal occupation, and he receives handsome compensation, including $19,246,604 in 2018 for his services. Additionally, as stated in the 2018 Proxy Statement, Defendant Adamczyk's role in facilitating the spin-offs of Garrett and Resideo contributed to him receiving additional incentive compensation. Defendant Adamczyk was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings and press releases referenced herein, many of which he either personally made or signed off on. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting

and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Adamczyk is a defendant in the Securities Class Action. For these reasons, Defendant Adamczyk breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

223.    Additional reasons that demand on Defendant Angove is futile follow. Defendant Angove has served as a Company director since February 2018. He also serves as a member of the Management Development and Compensation Committee. Defendant Angove has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Angove breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

224.    Additional reasons that demand on Defendant Ayer is futile follow. Defendant Ayer has served as a Company director since 2015. He also serves as a member of the Management Development and Compensation Committee and the Corporate Governance and Responsibility Committee. Defendant Ayer has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Ayer signed, and thus personally made the false and

misleading statements in the 2017 10-K. For these reasons, Defendant Ayer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

225.   Additional reasons that demand on Defendant Burke is futile follow. Defendant Burke has served as a Company director since 2010. He also serves as a member of the Audit Committee. Defendant Burke has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Burke signed, and thus personally made the false and misleading statements in the 2017 10-K. For these reasons, Defendant Burke breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

226.   Additional reasons that demand on Defendant Davis is futile follow. Defendant Davis has served as a Company director since 2006, and as the Company's lead director since April 27, 2020. He also serves as a member of the Audit Committee. Defendant Davis has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Davis signed, and thus personally made the false and misleading statements in the 2017 10-K. For these

reasons, Defendant Davis breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

227.    Additional reasons that demand on Defendant Deily is futile follow. Defendant Deily has served as a Company director since 2006. She also serves as a member of the Audit Committee, and as the Chair of the Corporate Governance and Responsibility Committee. Defendant Deily has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the schemes to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Her insider sales, which yielded over $1.39 million in proceeds, demonstrate her motive in facilitating and participating in the fraud. Furthermore, Defendant Deily signed, and thus personally made the false and misleading statements in the 2017 10-K. For these reasons, Defendant Deily breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

228.    Additional reasons that demand on Defendant Gregg is futile follow. Defendant Gregg has served as a Company director since 2011. He also serves as a member of the Audit Committee, and the Management Development and Compensation Committee. Defendant Gregg has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore,

Defendant Gregg signed, and thus personally made the false and misleading statements in the 2017 10-K. For these reasons, Defendant Gregg breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

229.    Additional reasons that demand on Defendant Hollick is futile follow. Defendant Hollick has served as a Company director since 2004. He also serves as a member of the Management Development and Compensation Committee. Defendant Hollick has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Hollick signed, and thus personally made the false and misleading statements in the 2017 10-K. For these reasons, Defendant Hollick breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

230.    Additional reasons that demand on Defendant Lieblein is futile follow. Defendant Lieblein has served as a Company director since 2013. She also serves as a member of the Corporate Governance and Responsibility Committee, and as the Chair of the Management Development and Compensation Committee. Defendant Lieblein has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the schemes to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously

disregarded her duties to protect corporate assets. Furthermore, Defendant Lieblein signed, and thus personally made the false and misleading statements in the 2017 10-K. For these reasons, Defendant Lieblein breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

231.    Additional reasons that demand on Defendant Paz is futile follow. Defendant Paz has served as a Company director since 2009. He also serves as the Chair of the Audit Committee, and as a member of the Corporate Governance and Responsibility Committee. Defendant Paz has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Paz signed, and thus personally made the false and misleading statements in the 2017 10-K. For these reasons, Defendant Paz breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

232.    Additional reasons that demand on Defendant Washington is futile follow. Defendant Washington has served as a Company director since 2013. She also serves as a member of the Audit Committee. Defendant Washington has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the schemes to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously

disregarded her duties to protect corporate assets. Furthermore, Defendant Washington signed, and thus personally made the false and misleading statements in the 2017 10-K. For these reasons, Defendant Washington breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

233. Additional reasons that demand on the Board is futile follow.

234. Each of the Director-Defendants, individually and collectively, face a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by millions of dollars for its own common stock during the Relevant Period. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

235. As described above, Defendant Deily directly engaged in insider trading, in violation of federal law and the Company's Code of Conduct. Defendant Deily received proceeds of over $1.39 million as a result of insider transactions executed during the Relevant Period, when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to her, and excused.

236. Defendants Burke, Davis, Deily, Gregg, and Paz (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the Company's accounting and financial reporting processes, the Company's system of internal controls, the performance of the Company's internal audit function, and the Company's compliance with legal and regulatory requirements. The Audit Committee

Defendants failed to ensure the integrity of the Company's accounting and financial reporting processes, as they are charged to do under the Audit Committee Charter, allowing the Company to engage in improper accounting practices, to file false and misleading financial statements with the SEC, and to fail to maintain internal controls. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

237.   The Director-Defendants have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders.  In fact, five of the Director-Defendants have served on the Board for nearly a decade or longer.  These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Director-Defendants would be futile.

238.   In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to engage in improper accounting practices, to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act. In violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of company records, public reports and communications, and uphold the responsibilities related thereto.  Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

239.    Honeywell has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Honeywell any part of the damages Honeywell suffered and will continue to suffer thereby.  Thus, any demand upon the Director-Defendants would be futile.

240.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).  As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

241.    The acts complained of herein constitute violations of fiduciary duties owed by Honeywell's officers and directors, and these acts are incapable of ratification.

242.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Honeywell.  If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion."  As a result, if the Director-Defendants were to sue themselves

or certain of the officers of Honeywell, there would be no directors' and officers' insurance protection.  Accordingly, the Director-Defendants cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Director-Defendants is futile and, therefore, excused.

243.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Honeywell to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

244.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, certainly at least seven of the Directors, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Securities Exchange Act of 1934

245.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

246.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

247.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

248.    Under the direction and watch of the Directors, the 2018 Proxy Statement failed to disclose that: (1) the Company had engaged in improper accounting methods in order to conceal the true extent of Bendix's asbestos liabilities, in violation of ASC 450; (2) the Company was able to estimate potential liability arising from Bendix-related asbestos claims more than five years into the future, contrary to the Individual Defendants' representations; (3) as a result of the foregoing, the Company's net income and comprehensive income were artificially inflated, and the Company's financial statements were inaccurate and were not in compliance with GAAP or relevant industry norms; (4) as a further result of the foregoing, the SEC would inquire into the Company's accounting practices related to Bendix's asbestos liabilities, which would ultimately lead to a full-blown investigation; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

249.    The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

250.    Moreover, the 2018 Proxy Statement was false and misleading when it discussed the Company's adherence to specific governance policies and procedures, including the Code of Conduct, due to the Individual Defendants' failures to abide by them and their causing the Company to engage in improper accounting practices and issue false and misleading statements and/or omissions of material fact.

251.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2018 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2018 Proxy Statement, including but not limited to, election of directors, advisory approval of executive compensation, ratification of the Company's independent auditor, reduction of the ownership threshold required to call a special meeting of shareholders, and approval of stockholder proposals regarding the appointment of an independent Board Chairman and disclosure of the Company's lobbying payments and policies.

252.    The false and misleading elements of the 2018 Proxy Statement led to the rejection of the stockholder proposals regarding the appointment of an independent Board Chairman and disclosure of the Company's lobbying payments and policies, and to the re-election of Defendants Adamczyk, Angove, Ayer, Burke, Davis, Deily, Gregg, Hollick, Lieblein, Pardo, Paz, and Washington, which allowed them to continue breaching their fiduciary duties to Honeywell.

253.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2018 Proxy Statement.

254.    Plaintiff on behalf of Honeywell has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Violations of

**Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934**

255.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

256.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Honeywell.  Not only is Honeywell now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Honeywell by the Individual Defendants.  With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase millions of its own shares on the open market at artificially-inflated prices, damaging Honeywell.

257.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

258.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Honeywell not misleading.

259.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and

did control the conduct complained of herein and the content of the public statements disseminated by Honeywell.

260.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.  The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

261.    In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive or director of the Company, as members of the Board, each of the Individual Defendants then serving as a director made and/or signed the Company's Form 10-Ks filed with the SEC during the Relevant Period.

262.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

263.    Plaintiff on behalf of Honeywell has no adequate remedy at law.

### THIRD CLAIM

**Against the Individual Defendants for Violations of Section 20(a)
of the Securities Exchange Act of 1934**

264.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

265.     The Individual Defendants, by virtue of their positions with Honeywell and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Honeywell and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act.  The Individual Defendants had the power and influence and exercised the same to cause Honeywell to engage in the illegal conduct and practices complained of herein.

266.     Plaintiff on behalf of Honeywell has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

267.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

268.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Honeywell's business and affairs.

269.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

270.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Honeywell.

271.     In breach of their fiduciary duties owed to Honeywell, the Individual Defendants willfully or recklessly caused the Company to engage in improper accounting practices, and made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose that: (1) the Company had engaged in improper accounting methods in order to conceal the true extent of Bendix's asbestos liabilities, in violation of ASC

450; (2) the Company was able to estimate potential liability arising from Bendix-related asbestos claims more than five years into the future, contrary to the Individual Defendants' representations; (3) as a result of the foregoing, the Company's net income and comprehensive income were artificially inflated, and the Company's financial statements were inaccurate and were not in compliance with GAAP or relevant industry norms; (4) as a further result of the foregoing, the SEC would inquire into the Company's accounting practices related to Bendix's asbestos liabilities, which would ultimately lead to a full-blown investigation; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

272.    The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact.

273.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

274.    In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices before the fraud was exposed, while two of the Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately 2.36 million.

275.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were

available to them.  Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Honeywell's securities and disguising insider sales.

276.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Honeywell's securities and disguising insider sales.

277.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

278.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Honeywell has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

279.    Plaintiff on behalf of Honeywell has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

280.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

281.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Honeywell.

282.    The Individual Defendants either benefitted financially from the improper conduct and their engaging in lucrative insider transactions tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Honeywell that was tied to the performance or artificially inflated valuation of Honeywell, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

283.    Plaintiff, as a shareholder and a representative of Honeywell, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

284.    Plaintiff on behalf of Honeywell has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Abuse of Control

285.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

286.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Honeywell, for which they are legally responsible.

287.    As a direct and proximate result of the Individual Defendants' abuse of control, Honeywell has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Honeywell

has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

288.    Plaintiff on behalf of Honeywell has no adequate remedy at law.

## SEVENTH CLAIM

### Against Individual Defendants for Gross Mismanagement

289.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

290.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Honeywell in a manner consistent with the operations of a publicly-held corporation.

291.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Honeywell has sustained and will continue to sustain significant damages.

292.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

293.    Plaintiff on behalf of Honeywell has no adequate remedy at law.

## EIGHTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

294.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

295.    The Individual Defendants caused the Company to engage in improper accounting practices, to repurchase its own stock at artificially inflated prices, and to pay themselves excessive salaries, bonuses, fees, and stock grants to the detriment of the shareholders and the Company.

296.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Honeywell to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

297.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

298.    Plaintiff on behalf of Honeywell has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Honeywell, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Honeywell;

(c)    Determining and awarding to Honeywell the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Honeywell and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Honeywell and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

    1.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

    2.  a provision to permit the shareholders of Honeywell to nominate at least seven candidates for election to the board; and

    3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

    (e)    Awarding Honeywell restitution from the Individual Defendants, and each of them;

    (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

    (g)    Granting such other and further relief as the Court may deem just and proper.

Dated: June 15, 2020                Respectfully submitted,

                                      **FARNAN LLP**

                                      _/s/ Michael J.. Farnan_
                                      Brian E. Farnan (Bar No. 4089)
                                      Michael J. Farnan (Bar No. 5165)
                                      919 N. Market St., 12th Floor
                                      Wilmington, DE 19801
                                      Telephone: (302) 777-0300
                                      Facsimile: (302) 777-0301
                                      Email: bfarnan@farnanlaw.com
                                             mfarnan@farnanlaw.com

Of Counsel:

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060

Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net